## UNITED GAS PUBLIC SERVICE CO. v. STATE et al.

### No. 8176.

Court of Civil Appeals of Texas. Austin.
Oct. 30, 1935.

Rehearing Denied Jan. 8, 1936.

Baker, Botts, Andrews & Wharton, Tom Scurry, and F. G. Coates, all of Houston, and Mann & Mann, of Laredo, for appellant.

Wm. McCraw, Atty. Gen., Scott Gaines and Alfred M. Scott, Asst. Attys. Gen., Hicks, Dickson & Lange and Edward H. Lange, all of Laredo, and A. R. Stout, of Houston, for appellees.

BLAIR, Justice.

In February, 1909, the city of Laredo granted certain individuals a 25-year franchise to construct and operate a natural gas distribution system in said city. The franchise and all rights thereunder were acquired by appellant through the mesne conveyances of several predecessors. The ordinance and some of the orders and proceedings here involved occurred before appellant acquired the franchise; but it is bound by them, and will be considered as having owned and operated the franchise at all times.

From the year 1921 to December, 1931, the natural gas rate for domestic use in Laredo was 75 cents per M.C.F., with 10 per cent. discount if bill was paid within 10 days from date, and with a minimum monthly bill of $1 per customer. On December 15, 1931, the city of Laredo, a home rule chartered city, acting under the authority given by article 1175, R.S. 1925, by ordinance fixed the natural gas rate for domestic use at 40 cents per M.C.F., with 10 per cent. discount if bill was paid in 10 days, and with a minimum monthly bill of $1 per customer; the ordinance providing that the rate would be effective from January 1, 1932. An appeal under article 6058, R.S. 1925, was perfected from the ordinance to the Railroad Commission. Appellant filed a bond in the sum of $20,-000, conditioned that it would refund any excess rates over the rates finally determined to be fair and reasonable. Pending said appeal, appellant filed an application for an increase of the 75-cent domestic rate, which was not acted upon by the city of Laredo because of the pendency of the matter before the commission; and thereafter appellant perfected an appeal, based on this application, to the commission, filing a bond conditioned as the one in the first appeal. The commission consolidated the two appeals, heard them on their merits, and on June 13, 1933, promulgated its order fixing the natural gas rate for do-

mestic use at 55 cents per M.C.F., with minimum monthly bill of $1 per customer. The order provided for a 10 per cent. penalty if bill was not paid within 10 days from date, provided that the 55-cent rate would be effective from January 1, 1932, and further provided that appellant refund to the customers the difference in the amount collected after January 1, 1932, under the 75-cent rate and the 55-cent rate; appellant having continuously collected the 75-cent rate.

On June 29, 1933, appellant filed its bill in equity in the federal District Court, naming the members of the Railroad Commission, the Governor, the Attorney General, and the city of Laredo and its governing officials as defendants, seeking to restrain them from enforcing the 55-cent rate pending a hearing of the matter by a statutory federal court of three judges, alleging that, because the 55-cent rate would not afford appellant a reasonable return on the fair value of its property used in the public service, the rate order was confiscatory and in violation of the just compensation, the equal protection, and the due process clauses of the Federal Constitution.

On July 26, 1933, appellees, the parties named as defendants in appellant's suit in the federal court, filed this suit in the district court of Travis county, alleging that appellant had filed its aforementioned bill in equity in the federal court, and that appellees brought this suit in the nature of an appeal under the terms of article 6059, R.S. 1925, but that "such appeal is not taken because plaintiffs (appellees) are dissatisfied with the rates and charges prescribed in the Commission's said order, but primarily for the purpose of protecting the jurisdiction of the court and its venue to hear and finally determine the matters in controversy, and to enforce the said order, if it should be deemed to be valid upon final hearing," which order appellant was alleged to have continuously violated since its promulgation; and prayer was that appellant be enjoined from charging or collecting any rates for natural gas in excess of the 55-cent rate fixed by the commission, and that the city of Laredo recover for the consumers the difference in the amount collected under the 75-cent rate and the 55-cent rate. Appellees also requested that, pending the final determination of the cause, an order be entered staying all proceedings by the commission or

city of Laredo in the collection of the 55-cent rate, which order was entered by the state district court on the date the petition was filed.

On August 1, 1933, appellant and appellees appeared before the statutory three-judge federal court, and appellees' motion to stay all proceedings in that cause until final disposition of the Travis county district court cause was granted; the statutory federal court also enjoined the enforcement of the 55-cent rate, "pending the final disposition of the cause" in the state district court. On the date of this stay order by the three-judge court, appellant filed its petition in the federal District Court, praying for the removal of the cause from the state to the federal court. Appellees answered with a motion to remand the cause to the state court; which motion was granted.

In the state court appellant filed an answer, attacking the 55-cent rate, alleging that the rate order was based on assumption contrary to the facts with regard to the average annual revenues of appellant, and was therefore not supported by any evidence, and that, because the 55-cent rate did not yield a net return of 7 per cent. per annum from January 1, 1932, down to the date of the trial (in April, 1934), and would not yield a reasonable return on the fair value of the property used in the public service, the rate order was therefore unjust and unreasonable and confiscatory and in violation of the just compensation, the equal protection, and the due process clauses of both the State and Federal Constitutions; and prayer was that the appellees be restrained from enforcing the alleged void order.

Under the pleadings and proceedings, the suit filed by appellees in the district court of Travis county was merely one to bring appellant within the jurisdiction of the state court as provided for by section 266 of the Judicial Code of the United States (28 U.S.C.A. § 380), in order to determine the validity of the 55-cent rate; and the amended answer of appellant therein, seeking to enjoin the enforcement of the 55-cent rate, was in effect an appeal by it under article 6059, to determine whether the rate order was unjust and unreasonable as to appellant, and to determine the additional question of whether the enforcement of the rate would result in confiscation of appellant's property used in the public service, rendering the

rate order unconstitutional. Upon the issues thus joined in the state court, a trial was had to a jury. The court's charge consisted of definitions and instructions and the following special issue: "Do you find that the order of the Railroad Commission of Texas bearing date June 13, 1933, providing for a $0.55 gas rate to residential consumers within the City of Laredo, Texas, under the facts introduced in evidence before you, is unreasonable and unjust to defendant United Gas Public Service Company? Answer this question 'Yes' or 'No.'"

The jury answered the issue "No." Accordingly, the judgment enjoined appellant from charging rates in Laredo in excess of the 55-cent rate fixed by the commission until changed by the commission or other authorized authority, dissolved the stay order of June 26, 1933, and provided for a suspension of the judgment upon the perfecting of an appeal and the filing of a supersedeas bond in the sum of $30,000. The judgment declared the commission's order fixing the 55-cent rate to be valid, except that portion making the 55-cent rate effective from January 1, 1932, and for a refund of the difference between the 75-cent rate and the 55-cent rate, but without prejudice to any rights for the collection of such difference in rates should the 55-cent rate be held valid on appeal. Appellant has appealed from the portion of the judgment enjoining it from charging in excess of the 55-cent rate, and has filed a supersedeas bond. Appellees have appealed from the portion of the judgment denying a recovery of refunds.

Appellant briefs the appeal in two parts. In "Part I" and by propositions 1 to 10, appellant seeks to have the judgment below reversed and judgment rendered for it. In "Part II" of the brief and by propositions 11 to 79, appellant contends that the judgment should be reversed and the cause remanded, because of several alleged errors of practice.

We have reached the conclusion that appellant not only failed to establish its claim for reversal and rendition of judgment in its favor, but that, when viewed in the light of the presumption in favor of the validity of the commission's rate order and of the quantum and character of proof required to overcome such presumption, the evidence adduced was insufficient, as a matter of law, to show that the 55-cent rate order was either unjust and unreasonable or confiscatory. In view of this conclusion, all questions of practice presented in "Part II" of the brief go out of the case.

The commission found in its rate order that the fair value of appellant's property used in the public service as of August 1, 1932, was $885,000, that a 3 per cent. annual reserve accrual for depreciation on such valuation was fair and reasonable, and that a 7 per cent. annual return on such valuation of the property was fair and reasonable, and that a gas rate of 55 cents for domestic use was fair and reasonable. However, the commission reluctantly included in the property valuation an item of $124,688, representing the Pascadito-Jennings transmission pipe line of approximately 26 miles, which was only used one day during the last 12 months of the operating period, and which the commission found could "neither be safely nor profitably used in transporting gas" to Laredo. The commission also included the West Jennings gathering system at a value of $10,342, although it found that these "two property items are neither used nor are they necessary as standby equipment." There was also evidence before both the trial court and the commission which tended to show the fair value of appellant's property to be about $700,000, and that a 2 per cent. annual accrual for depreciation would be fair and reasonable. Appellant's witnesses placed its value at slightly over $1,000,000. When the properties serving Laredo were transferred to appellant by its subsidiary and predecessor in title, Texas Border Gas Company, on October 31, 1932, the journal entry on appellant's books reflected a total value of $934,798.02, with a reserve for depreciation of $78,632.20, which included the Roma-Jennings pipe line not servicing Laredo, and which with other property was valued on the books of appellant's predecessor in title in 1929, at $848,232.98. The separate value of the Roma-Jennings pipe line was not shown; but, based upon these book entries and other facts, the expert witness for appellees arrived at his $698,047 present valuation of appellant's property used in servicing gas in Laredo.

On the hearing before the commission the operating revenues and operating expenses for slightly more than the four fiscal years next preceding the hearing were used. This operating period extended from June 30, 1928, through July 31, 1932; the

four fiscal years being the three 12-month periods ending, respectively, June 30, 1929, 1930, and 1931, and the 12-month period ending July 31, 1932. The reasons stated by the commission in the rate order for using said operating periods and employing the method used are as follows:

"The Company presented a 'set up' of operating revenues and expenses for the 12 months period ending July 31, 1932, only, for consideration in the computation of a fair return upon its plant value. On the other hand, the City presented a similar 'set up' covering the years ending June 30, 1929, 1930, and 1931, and for the year ending July 31, 1932—a period of four years; it contended that since the year ending July 31, 1932, was patently a subnormal business year, such single year should not be taken alone as the test period for the computation necessary. It is our opinion that the one year ending July 31, 1932, should not be taken as the test period. It is a matter of common knowledge, we believe, that from a general business standpoint, the year 1932 was the worst year since 1929. The City's Exhibit L shows that the fiscal year 1931, in comparison with the years immediately preceding it, was subnormal also; therefore, the year 1931 should not be taken as the test period, nor should an average of these two years be taken.

"Just as it would be unfair to the City to take 1932, or 1931, alone, or an average of both, as the test period, it would be unfair to the Company to take the year 1930, or even an average of the 3 years 1930, 1931, and 1932, as the test period, as it is shown that the year 1930 was the best year, in point of gross revenues, that the Company had experienced since 1928.

"The year 1929, while it was a better year than 1931 in point of gross revenue by $27,168, was a leaner year than 1930 by $38,153; its inclusion in the test period tends to equalize the effect of the inclusion of the better year, 1930.

"Therefore, in the light of ample lawful precedent for the taking of an average of 4 successive years immediately preceding the date of the investigation, as the test period, and because in so doing we believe that justice is done to both parties, we are of the opinion and hold that an average of revenues and expenses for the four fiscal years 1929, 1930, 1931 and 1932, constitutes the test period for the computation of the

rate structure upon which a fair return is to be predicated."

The gross revenues and their sources for the four fiscal years as obtained from appellant's calculations were as follows:

| 12 Months Ended | Central Pow. & Lt. Co. & Motor Fuel Products Co. | Other Sources | Total |
|---|---|---|---|
| June, 1929 | $68,188.69 | $222,516.93 | $290,705.62 |
| June, 1930 | 91,603.56 | 237,989.24 | 329,592.80 |
| June, 1931 | 56,415.13 | 206,577.17 | 262,992.30 |
| July, 1932 | 15,398.30 | 179,126.27 | 194,524.57 |

The total operating revenues, operating expenses and net revenues as obtained from appellant's calculations for the four fiscal years were as follows:

| | Year Ended | | | |
|---|---|---|---|---|
| | June 30, 1929. | June 30, 1930. | June 30, 1931. | July 31, 1932. |
| Op. Revenues | $290,705.62 | $329,592.80 | $262,992.30 | $194,458.09 |
| Op. Expenses | 141,253.38 | 167,261.38 | 133,644.64 | 114,149.62 |
| Net Revenue | $149,452.24 | $162,331.42 | $129,347.66 | $ 80,308.47 |

The gross revenues and their sources for the additional operating period used in the trial court on appeal were as follows:

| 12 Mos. Ended: | Revenues from Central Power & Lt. Co. and Motor Fuel Prod. Co. | Other Revenues | Total |
|---|---|---|---|
| Dec. 31, 1932 | $8,790.20 | $174,987.21 | $183,777.41 |
| Dec. 31, 1933 | 54.40 | 158,699.24 | 158,753.64 |

The decrease in industrial revenues was because the Motor Fuel Products Company had ceased to do business, due to large operating losses, and because the Central Power & Light Company had completed and put in operation in Laredo its main transmission line from its central operating plant at another point, the Laredo plant, which appellant served with gas for fuel, had become a mere emergency or stand-by plant, and will not hereafter be used except for short periods during emergencies.

Based upon the aforementioned evidence, an expert accountant employed by appellees, after deducting the non-recurring industrial revenues and certain questioned items of expenses, computed the net returns for each of the five 12-month operating periods, ending June 30, 1929, 1930, 1931, July 31, 1932, and December 31, 1933, respectively, and averaged the annual net

operating revenues available for the five years, as follows:

Appellees offered evidence tending to show that, if the 55-cent rate had been

| | 12-Mo. Period Ending June 30, 1929 | 12-Mo. Period Ending June 30, 1930 | 12-Mo. Period Ending June 30, 1931 | 12-Mo. Period Ending July 31, 1932 | 12-Mo. Period Ending Dec. 31, 1933 |
|---|---|---|---|---|---|
| Gross Operating Revenues (S. F. Vol. III, p. 1786) | $290,705.62 | $329,592.80 | $262,992.30 | $194,458.09 | $158,822.62 |
| Less Non-Recurring Revenues (S. F. Vol. IV, p. 2115) | 68,188.69 | 91,603.56 | 56,415.13 | 15,398.30 | 54.40 |
| Total Recurring Revenue: (S. F. Vol. II, pp. 1083-84) | $222,516.93 | $237,989.24 | $206,577.17 | $179,059.79 | $158,768.22 |
| Gross Operating Expenses (S. F. Vol. III, p. 1786) | $141,253.38 | $167,261.38 | $133,644.64 | $114,149.62 | $ 93,298.46 |
| Less Non-Recurring Gas Purchases (S. F. Vol. II, pp. 1083-84) | 22,885.04 | 29,529.98 | 21,274.18 | 4,176.46 | –0– |
| | $118,368.34 | $137,731.40 | $112,370.46 | $109,973.16 | $ 93,298.46 |
| Less Questioned Items of Operating Expenses (S. F. Vol. III, p. 1795) | 9,663.33 | 16,541.54 | 20,198.69 | 27,347.05 | –0– |
| Total Net Operating Expenses | $108,705.01 | $121,189.86 | $ 92,171.77 | $ 82,626.11 | $ 93,298.46 |

RECAPITULATION

| | | | | | |
|---|---|---|---|---|---|
| Total Net Recurring Revenue: | $222,516.93 | $237,989.24 | $206,577.17 | $179,059.79 | $158,768.22 |
| Less: Total Net Operating Expenses: | 108,705.01 | 121,189.86 | 92,171.77 | 82,626.11 | 93,298.46 |
| Net Available Return: | $113,811.92 | $116,799.38 | $114,405.40 | $ 96,433.68 | $ 65,469.76 |

Average Annual Net operating revenue for the five 12 months' periods....................$101,384.02

Average Annual Net operating revenue for the four 12 months' periods, which 4 periods were presented in evidence before the R. R. Commission (June 30, 1928, to July 31, 1932) ..............................................................................................$110,362.59

Average Annual Net operating revenue for the three 12 months' periods ending June 30, 1931, July 31, 1932, and Dec. 31, 1933.................................................$ 92,102.94

Average Annual Net operating revenue for the two 12 months' periods ending July 31, 1932, and Dec. 31, 1933.........................................................................$ 80,951.72

In applying the several average annual net operating revenues appearing on the preceding page, the following average Annual Rates of Return are found:

1. Average net operating revenue for the five 12 months' periods...................................$101,384.02
   Less annual depreciation @ 3% on $885,000.00.................................................... 26,550.00

   Amount available for return at existing rates............................................$ 74,834.02

   Average Annual Rate of Return, i. e., $885,000 divided into $74,834.02, equals.............8.46%

2. Average net operating revenue for the four 12 months' periods, which 4 periods were presented in evidence before the Railroad Commission (June 30, 1928 to July 31, 1932)......$110,362.59
   Less annual depreciation @ 3% on $885,000.00.................................................... 26,550.00

   Amount available for return at existing rates............................................$ 83,812.59

   Average Annual Rate of Return, i. e., $885,000 divided into $83,812.59, equals...........9.47%

3. Average operating revenue for the three 12 months' periods ending June 30, 1931, July 31, 1932, and Dec. 31, 1933.........................................................................$ 92,102.94
   Less 3% annual depreciation (S. F. Vol. III, p. 1745)...................................... 26,550.00

   Amount available for return at existing rates............................................$ 65,552.94

   Average Annual Rate of Return, i. e., $749,990 (Tr. pp. 25, and 36) divided into $65,552.94, equals ...........................................................................................8.74%
   Average Annual Rate of Return, i. e., $885,000 divided into $65,552.94, equals............7.41%

4. Average operating revenue for the two 12 months' periods ending July 31, 1932 and Dec. 31, 1933 ............................................................................................$ 80,951.72
   Less 3% annual depreciation (S. F. Vol. II, p. 1430)...................................... 25,000.00

   Amount available for return at existing rates............................................$ 55,951.72

   Average Annual Rate of Return, i. e., $700,000 divided into $55,951.72, equals..............7.99%
   Average Annual Rate of Return, if the items of $124,668 and $10,342 (Total $135,010) which were considered by the Commission as neither used and useful, nor necessary (Tr. pp. 25 and 36) are deducted from the rate base of $885,000: $749,990 divided into $55,951.72, equals ................................................................................7.46%

actually put into effect, it would have produced approximately 1,500 additional meters, at $1 per month minimum, and would have increased the use of gas by present consumers. Appellant's evidence tended to show that any such increase in revenues because of the lower rate was speculative. Appellant has continuously charged and collected the 75-cent rate.

The exact calculations on which the commission computed the 55-cent rate do not appear in its rate order nor in the record on appeal. But appellant insists that it appears from the opinion that the commission found the fair value of the property to be $885,000, its annual depreciation to be 3 per cent., and 7 per cent. to be a reasonable annual return thereon, and applied such findings to the average net revenues received by appellant in the four fiscal years used in the hearing. Appellant contends that "the practical result of using this device was to greatly overstate the net revenues actually being received from existing rates at the date of inquiry, to assume that revenues which had stopped coming in were still being collected, and to apply revenues received during an era of good business, rapid growth and a higher level of prices of construction labor and material to a rate base determined at depression prices, and to test requirements for return at the percentage therefor fixed in consideration of depressed business conditions." And, by propositions 1 to 10, appellant in one way or another, contends that the evidence showed, as a matter of law, that the 55-cent rate order was confiscatory and per se unjust and unreasonable, on two grounds, as follows:

(1) That, because the existing 75-cent rate did not yield a 7 per cent. return on the $885,000 valuation of the property from January 1, 1932, the effective date of the city ordinance, to December 31, 1933, or down to the date of the trial in April, 1934, the lower 55-cent rate would necessarily not yield a reasonable return on appellant's property.

(2) That, in making its calculations for the 55-cent rate, the commission assumed that appellant's revenues from January 1, 1932, would equal its revenues for the period beginning June 30, 1928, and ending July 31, 1932, which assumption was contrary to the facts, because it was assumed that the revenues from the two industrial sources which had stopped coming in were still being collected, and because of existing depression conditions, revenues had decreased, and for which reasons the 55-cent rate would not afford a reasonable return on the fair value of appellant's property.

The contention that the rate order is unenforceable because the existing 75-cent rate did not yield a 7 per cent. return on the $885,000 property valuation from January 1, 1932, to December 31, 1933, the lower 55-cent rate would necessarily not afford a reasonable return, is not sustained. The year ending December 31, 1933, was the last fiscal year of the five-year period of business operations used in the trial court. It was admittedly an abnormal year, because of high temperature prevailing during the winter months, and because of a decrease in the purchasing power of consumers, due to the business depression prevailing everywhere. The rule is settled that rates are not based upon the results of business of any one year alone, but upon what is estimated as being the average business over a period of years; the future being gauged as nearly as possible by the past experience. The reason for the rule is the fact that any business may fluctuate from year to year because of changing conditions or circumstances which may affect it. Ordinarily, a test of five years or more next preceding the inquiry, if available, is selected. It is also the rule that only actual experience under the rate complained of can furnish any real criterion or guide as to the effect of the rate on the business, and that this experience should be obtained by a practical test for such a period of time as will under the facts of the particular business determine the matters which are of doubtful or uncertain influence. In absence of an actual test of the rate, the court on appeal must resolve all doubts against the complaining party, pare down valuations unsparingly, and the rate must appear to be clearly confiscatory or unjust and unreasonable before the court should by injunction restrain its enforcement in advance of actual experience of the practical results of the rate. And while the equal protection, the due course, and the due process clauses of the fundamental laws of both state and nation (Const.Tex. art. 1, §§ 13, 19; Const.U.S. Amend. 14) guard against the taking of, or compelling of the use of, private property for public service without just compensation, still they do not assure the public utility the right under all conditions and circum-

stances to have a return upon the value of the property so used. If actual experience for a proper period of time under the rate complained of should reveal sufficient reasons, the rate order may then be changed through proper channels. City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S.Ct. 148, 53 L.Ed. 371; Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.(N.S.) 1134, 15 Ann.Cas. 1034; Public Service Comm. v. G. N. Utilities Co., 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080; Georgia Ry. & Power Co. v. Railroad Commission, 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144; Louisville v. Cumberland Tel. & Tel. Co., 225 U.S. 430, 32 S.Ct. 741, 56 L.Ed. 1151; Brush Electric Co. v. City of Galveston, 262 U.S. 443, 43 S.Ct. 606, 67 L.Ed. 1076; Reno P., L. & W. Co. v. Pub. Service Comm. (D.C.) 298 F. 790; Los Angeles Gas & Electric Corp. v. Railroad Comm. (D.C.) 58 F.(2d) 256, affirmed 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Denver Union Stock Yard Co. v. United States (D.C.) 57 F.(2d) 735; St. Joseph Stock Yards Co. v. United States (D.C.) 11 F. Supp. 322.

■■In the instant case appellant has continuously charged and collected the 75-cent rate; hence no actual test has been made under the lower 55-cent rate. An actual test of the lower rate might have resulted in a larger return, by bringing about an increase in appellant's business, and manifestly this court would not be warranted in holding that the lower rate was either confiscatory or unjust and unreasonable, as a matter of law, in advance of an actual test of the rate; but that, under the aforementioned rules as applied to the facts, appellant failed, as a matter of law, to show the rate either confiscatory or unjust or unreasonable. The $885,-000 valuation of appellant's property by the commission was extremely liberal, because it included at a valuation of more than $135,000 the two pipe lines which the undisputed evidence showed to be useless except as emergency or stand-by equipment, and their value for such purposes was not shown. So, when the property valuation is pared down to this lowest valuation (about $700,000), and doubtful items of expenses are deducted, the net revenues received by appellant under the 75-cent rate for the year ending December 31, 1933, would afford more than a 11 per cent. return. And calculations based on

the $700,000 valuation and the estimated difference in revenues between the 55-cent rate and the 75-cent rate show a return of more than 7 per cent. for the year 1933. But, even if the lower rate did not or would not yield a return of 7 per cent. for the year 1933, this court would not be warranted in enjoining the enforcement of the rate, because the test period was too short, no actual test was made under the lower rate, and the undisputed evidence showed the year to be abnormal.

Nor do we sustain appellant's second above stated ground as showing that the 55-cent rate would not as a matter of law afford a reasonable return on its property, because the commission assumed, contrary to the evidence showing loss of nonrecurring industrial revenues and decreasing revenues during the year 1932, that the revenues from and after January 1, 1932, would equal the average revenues for the June, 1928, to July, 1932, period used in the calculation fixing the 55-cent rate. If by this proposition appellant contends that only the operating revenues and expenses for the year ending July 31, 1932, should have been used by the commission in making its calculations and in fixing the 55-cent rate, then we have hereinabove determined the question against appellant.

Nor do we sustain the ground urged, if it is the contention of appellant that the commission erroneously based its calculations in fixing the 55-cent rate upon the average net revenues for the four fiscal years used by it, because the "practical result of using this device was to greatly overstate the net revenues actually being received from existing rates at the date of inquiry, to assume that revenues which had stopped coming in were still being collected, and to apply revenues received during an era of good business, rapid growth and a higher level of prices of construction labor and material to a rate base determined at depression prices, and to test requirements for return at the percentage therefor fixed in consideration of depressed business conditions."

■■As herein above stated, the calculation upon which the commission based the 55-cent rate order is not shown in the evidence; nor does it appear to be material on this appeal as to what method or calculation the commission used, because the only ground alleged by appellant as showing the rate order to be either confiscatory or unjust and unreasonable was

that the 55-cent rate would not afford a reasonable return on the fair value of appellant's property used in the public service. Under our statutes and practice, the trial of both of these issues on the appeal to the court is de novo, and is controlled by the principles governing the scope of a court review on appeal of the legislative function of the commission in making or fixing a public utility rate. Lone Star Gas Co. v. Commission (Tex.Civ.App.) 86 S. W.(2d) 484, recently decided by this court, in which case we discussed at length the scope of judicial appellate review of a public utility gas rate fixed by the commission. Suffice it to say here: That rate making is essentially a legislative function. That rates fixed by the commission have the same force and effect of statutes, and are subject to court review to the extent only as statutes of the same import are so subject, with the additional statutory authority of the court to determine whether the rate is unjust and unreasonable, and the inherent power of the court to determine the constitutional question of confiscation. M.-K. & T. Ry. Co. v. R. R. Commission (Tex.Civ.App.) 3 S.W.(2d) 489, affirmed Producers' Ref. Co. v. M., K. & T. R. Co. (Tex.Com.App.) 13 S.W.(2d) 679. That the rate fixed by the commission is presumed to be valid, reasonable, and just until declared otherwise by a court of competent jurisdiction. R. R. Com. v. Uvalde Construction Co. (Tex. Civ.App.) 49 S.W.(2d) 1113. That, in order to overcome this presumption in favor of the validity of the rate on the constitutional ground of confiscation, the burden of proof rests heavily upon the complaining party. Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. That, in order to set aside the rate as being unjust and unreasonable, the statute (article 6059) requires the complaining party to show "by clear and satisfactory evidence that" such rate is "unreasonable and unjust." That the complaining party attacking a rate as being unreasonable and unjust must allege facts which, if proved, would show the rate to be unjust and unreasonable as a matter of law, and to prove by clear and satisfactory evidence "which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable." R. R. Comm. v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573, 580; R. R. Comm. v. Weld & Neville, 96 Tex. 394, 409, 73 S.W. 529. That, in ad-

vance of any actual test of the practical result of the new rate, the court on appeal will not disturb the rate where it is based upon conflicting evidence as to valuations of property or as to any other item used as a basis for the calculation of the rate, because to do so would merely substitute the findings of the court or jury upon conflicting evidence for that of the commission, and would therefore permit the court to exercise the legislative function of rate making. R. R. Comm. v. Shupee (Tex. Civ.App.) 57 S.W.(2d) 295, affirmed 123 Tex. 521, 73 S.W.(2d) 505. And that, by "resolving all doubts against" the appellant, "and using valuations pared down unsparingly," there could have been no reasonable doubt in the judicial mind that the 55-cent rate was neither confiscatory nor unjust and unreasonable. Newton v. Consolidated Gas Co., 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538, 547.

The auditor for Laredo showed in his above-quoted calculations that the average net revenue for the five-year period used in the trial court, less annual depreciation at 3 per cent. on the $885,000 valuation of appellant's property, would yield an average annual return of 8.46 per cent. If under the rule that, in absence of any actual test of the new rate, the court must resolve all doubts against appellant and pare down unsparingly valuations, and if the lowest valuation shown by the evidence (about $700,000) is used in the calculation, then the average net return received by appellant under the existing rate for the five-year period would yield an average annual return of more than 10 per cent. The same calculations of the auditor also show that, if the average net revenues for the four-year period used in the hearing before the commission are utilized, such revenues, less 3 per cent. on the $885,000 valuation of appellant's property, would yield an average annual return of 9.47 per cent. If the lower $700,000 valuation is used in the calculation, the average net revenues for the four-year period would yield a return of more than 11 per cent. Thus it was shown that, under the existing rate, appellant has received an average annual return, even through several depression years, of about 11 per cent. on the value of its property used in the public service. And, since an actual test of the new rate may bring in a larger return, by bringing about an increase in business, we do not feel warranted in setting the

rate aside in absence of an actual test under the new rate. Brush Electric Co. v. City of Galveston, 262 U.S. 443, 43 S.Ct. 606, 67 L.Ed. 1076. And manifestly the evidence of appellant did not show, as a matter of law, that the lower 55-cent rate would necessarily result in confiscation of its property, nor that the rate was unenforceable because unjust and unreasonable, when viewed in the light of aforementioned rules with regard to the quantum and character of proof required in such cases.

The rate order of the commission, dated June 13, 1933, provided that the 55-cent rate fixed by it should be effective from and after January 1, 1932, the effective date of the ordinance of the city of Laredo, which fixed the rate of 40 cents. The commission's order further provided, as follows: "It is further ordered by the Railroad Commission of Texas that the Texas Border Gas Company shall refund to the City of Laredo, for the benefit of the domestic consumers, the difference between the amount collected by the Border Gas Company and the amount that would have been due by domestic consumers under this order."

The trial court declared this provision of the rate order invalid and of no force and effect, but without prejudice to the rights of the city of Laredo to bring suit for the refund "should this provision be held valid upon final determination of this cause on appeal." By cross-assignments of error, appellees seek to have this portion of the trial court's judgment reformed so as to declare said provision for the refund valid and enforceable.

We have reached the conclusion that the provision of the rate order making the 55-cent rate retroactively effective as of January 1, 1932, and providing for the refund of any amount collected in excess thereof is valid and enforceable. The authority to initiate the proceeding to reduce the gas rate is in the city of Laredo under article 1175, and the utility is given the right of an appeal from the ordinance fixing the rate to the commission under article 6058, the material portions of which read, as follows: "When a city government has ordered any existing rate reduced, the gas utility affected by such order may appeal to the Commission by filing with it on such terms and conditions as the Commission may direct, a petition and bond to review the decision, regulation, ordinance, or order of the city, town or municipality. Upon such appeal being taken the Commission shall set a hearing and may make such order or decision in regard to the matter involved therein as it may deem just and reasonable. The Commission shall hear such appeal de novo."

The appeal to the commission under the terms of this article is essentially to review the city ordinance fixing the gas rate, and, since it "may make such order or decision in respect to the matter (rate) involved therein as it may deem just and reasonable," the commission's functions are not only legislative, but quasi judicial as well. In the exercise of these reviewing and quasi judicial functions, the commission is authorized to suspend, pending the appeal before it, the rate fixed by the city ordinance, and to require the utility to give a bond "on such terms and conditions as the Commission may direct." Accordingly, on the appeal to the commission, appellant filed its bond, which was approved and accepted by the commission, and which bond was conditioned as follows: " * * * Principal and surety shall refund and pay to the City of Laredo for the benefit of the consumers in said city, any excess of rates or charges collected by the principal * * * over and above the rates or charges that shall be finally determined a fair and reasonable return. * * *"

The supersedeas bond filed in this appeal is similarly conditioned.

Since the commission had the power to suspend the reduced city ordinance rate pending the appeal, it necessarily had the power to reinstate such rate if found to be just and reasonable as of its original effective date. Likewise the commission had the power upon determining that the city ordinance rate was unjust or unreasonable, to substitute its own just and reasonable rate therefor, and to make it effective as of date of the city ordinance rate for which it was substituted.

It is further manifest that the powers given the commission by article 6058 to review a city ordinance rate on appeal and to determine its justness and reasonableness and, if found to be unjust and unreasonable, to substitute its own just and reasonable rate therefor, are not only legislative and administrative functions, but quasi judicial as well; and, in the full exercise of such power, it necessarily follows that the commission had the power to make its own rate effective as of the date of the

city ordinance rate, which it has reviewed and adjudicated as being unjust and unreasonable. See, as dealing with quasi judicial functions of utility commissions, Producers' Refining Co. v. M., K. & T. Ry. Co. (Tex.Com.App.) 13 S.W.(2d) 680; Baer Bros. Merc. Co. v. Denver & R. G. Ry. Co., 233 U.S. 479, 34 S.Ct. 641, 58 L. Ed. 1055; L. & N. Ry. Co. v. Finn, 235 U. S. 601, 35 S.Ct. 146, 59 L.Ed. 379. And, since the commission's functions are essentially to review and adjudicate the justness and reasonableness of the city ordinance rate on appeal, its jurisdiction necessarily relates back to the date of the initial proceedings in which the city ordinance rate originated and first became effective. The rule is settled that a public utility commission has the power to make its rate order retroactively effective as of any date after it has actually acquired jurisdiction of the cause, and, in consequence, may order the refund of excessive rates paid from and after the retroactively effective date of the rate order. See State ex rel. Boynton v. Public Service Comm. of Kansas, P.U.R. 1933a, 415; State ex rel. Kansas City Terminal R. Co. v. Public Service Com., 308 Mo. 359, 272 S.W. 957; Ill. Cent. R. R. Co. v. Vest (D.C.) 39 F.(2d) 658.

In accordance with our above conclusions, the judgment of the trial court is reformed so as to also declare the retrospective effective date and refund provision of the rate order of the commission valid and enforceable, and, as thus reformed, the judgment of the trial court will be affirmed.

Reformed and affirmed.