**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS et al., Appellees.**

**No. 13466.**

Court of Civil Appeals of Texas, Austin.

May 6, 1981.

Rehearing Denied May 13, 1981 (appellant).

Rehearing Denied May 20, 1981 (appellee).

Robert J. Hearon, Jr., Graves, Dougherty, Hearon, Moody & Garwood, Austin, for Southwestern Bell Tel. Co.

Mark White, Atty. Gen., Ronald G. Knight and Martha V. Terry, Asst. Attys. Gen., Austin, for Public Utility Commission of Texas.

Mike Willatt, Austin, for TATAS and TARS.

Brook Bennett Brown, McGinnis, Lochridge & Kilgore, Austin, for intervenors TASA and MUZAK.

Don R. Butler, Austin, Lee Holt, City Atty., Galen M. Sparks, Asst. City Atty., City of Dallas, Dallas, for Texas Municipal League.

Ray G. Besing, Besing & Armstrong, P.C., Dallas, for MCI Telecommunications Corp.

POWERS, Justice.

Southwestern Bell Telephone Company sued the Public Utility Commission in the district court of Travis County for judicial review of a final order promulgated by the agency. That order requires that the utility commence charging for its utility services sums designed to produce an annual increase in the utility's revenue equal to approximately $114.3 million, and requires it to refund monies previously collected from its customers under a system of charges designed to produce a higher increase in annual revenue.

The Commission required the utility to implement the order commencing February

28, 1981. Before that date, the utility filed its suit for judicial review, ancillary to which it sought and obtained from the district court a temporary restraining order suspending enforcement of the Commission's order. The temporary restraining order was renewed by a series of such orders issued by the district court.

On March 20, 1981, the district court denied the utility's application for a temporary injunction, by which the utility sought to enjoin enforcement of the Commission's final order pending a final hearing in the district court on the merits of its suit for judicial review. Thereafter, the distinct court entered its last temporary restraining order effective until April 3, 1981.

The utility immediately appealed to this Court for a review of the district court's denial of the application for temporary injunction. Ancillary to its appeal, the utility applied to this Court for an injunction to preserve our jurisdiction pending determination of the interlocutory appeal to this Court. We issued a temporary injunction for that purpose effective April 2, 1981.

Having now considered the utility's interlocutory appeal, we conclude that the district court did not abuse its discretion in denying the utility's application for a temporary injunction, and therefore affirm the order of the district court.

This appeal arose from the following events:

In July 1980, the utility filed with the Commission an application to increase the utility's annual revenue in the amount of $326.3 million. The Commission conducted the requisite hearing on the application during September and October 1980. During the period of the hearing, the Commission's staff recommended that the utility receive an increase in its annual revenue equal to $152.8 million.

When the Commission had not ruled on the application by November 11, 1980, the utility acted unilaterally to put into effect a temporary system of charges to its customers. Although the utility could lawfully have put into effect rates designed to produce the annual revenue contemplated in its application, it chose to implement rates designed to produce a lesser sum governed by the $152.8 million recommended by the Commission's staff.

In connection with this action, the Commission approved the form, sureties and amount of the bond posted by the utility as required by Section 43(e) of PURA. Under Section 43(f) of PURA these rates implemented by the utility are temporary and are superseded on service of the Commission's final order directing the implementation of other rates.

On January 29, 1981, the Commission rendered and issued its order relative to the utility's application. The order adopted the report of the Commission's hearings examiner with minor amendments. The order established an annual revenue increase equal to $114.3 million and directed the utility to refund the proper portion of the excess which resulted from the higher charges unilaterally implemented by the utility. By letter dated February 27, 1981, the Commission directed the utility to put into effect a reduced system of charges, designed to produce the annual revenue increase of $114.3 million, such new rates to become effective February 28, 1981.

The utility appealed the Commission's final order to a district court in Travis County, contending that the order was invalid because it resulted from numerous errors made by the Commission relative to several component parts of estimated revenues, estimated operating expenses, and rates of return. The utility contends these errors culminate in a rate of return that is "wholly inadequate and confiscatory." The claimed errors included want of substantial evidence to support the order generally; violation of numerous sections of PURA and TAP-

TRA;[2] violation of constitutional guarantees; errors in handling "known and measurable changes" brought timely to the Commission's attention before rendition of the final order; arbitrariness in disallowing expenses required to be paid by the utility under a contract with its parent company, and arbitrariness in allowing the utility to recover only 1.5% of such contract expenditures; errors in adjusting the utility's depreciation reserve; and application of an erroneous rate of return to a smaller portion of the utility's capital structure than was appropriate, compounding other errors and denying the utility its right to recover operating expenses and to earn the rate of return provided by law. The district court, of course, has not determined these issues to date.

In this interlocutory appeal, the utility contends that the district court abused its discretion by failing properly to apply the law in two respects: (1) in permitting the intervention of other litigants and (2) in refusing to grant the temporary injunction sought by the utility.

■ We overrule the first contention. If an order of a trial court *denying* intervention is not reviewable by interlocutory appeal, an order granting intervention is *a fortiori* not reviewable by interlocutory appeal. *See Mueller v. Banks*, 302 S.W.2d 447 (Tex.Civ.App.—Eastland 1957, writ ref'd). Since no final order has been entered by the trial court, we have no jurisdiction to consider this issue at this time. *Sun Oil Co. v. High Plains Underground Water Conservation Dist.*, 426 S.W.2d 347 (Tex.Civ.App.—Amarillo 1968, no writ).

The utility's second contention raises more difficult and fundamental questions involving the scope and intended effect of PURA and TAPTRA, particularly the provisions of Section 19 of TAPTRA which govern judicial review of administrative agency actions.

■ Section 85 of PURA authorizes the district court, Courts of Civil Appeals, and the Supreme Court of Texas, to suspend, in whole or in part, the operation of the Commission's order during the pendency of "an appeal." We construe the word "appeal" to include the filing of a petition for judicial review under Section 19 of TAPTRA. The named courts are instructed by Section 85 of PURA to grant or refuse an application to "stay" or suspend a Commission order in accordance with the practice of courts of equity. In this case, the district court denied such an application and the issue before us is whether the court abused its discretion in doing so. *Southwestern Bell Tel. Co. v. Public Utility Comm'n*, 571 S.W.2d 503 (Tex.1978).

■ The Commission's rate order may be suspended when three things are made to appear: (1) that there is a reasonable "probability" that the utility will succeed on the merits of its claim, after final hearing; (2) that the loss to the utility will be irreparable; and (3) that the customers of the utility will be adequately protected by bond during the period of time the Commission's order is suspended. *Id.* These three considerations may involve, of course, a consideration of many sub-issues, but a key consideration is always whether the loss alleged by the utility will be irreparable.

The utility claims that it will suffer irreparable loss if the Commission's order is not suspended during the period of judicial review. The loss claimed to be irreparable by the utility will follow in consequence of its being forced to implement rates that are too low, resulting either in "confiscation" or the lesser loss which follows from being forced to implement rates that are something less than "just, fair and reasonable." PURA § 18.

The utility claims that even if its contentions are finally sustained on the merits, it

**2.** Texas Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252– 13a (Vernon Supp. 1980–1981).

will nevertheless suffer a loss because, as a matter of law, it can never obtain recoupment for the difference between the lower rates ordered by the Commission and the higher rates the utility claims it is entitled to charge and which it intends to show on judicial review are "just, fair and reasonable." This proposition is based upon the claim that the Commission is forbidden to engage in "retroactive rate-making"; thus the agency would be powerless to allow recoupment of any such loss following the utility's success on appeal and a final court order of remand for further proceedings.

▮ The prohibition against "retroactive rate-making" is founded upon the premise that rate-making is a legislative function of an administrative agency and like all legislation, is generally prospective only. For example, the opinion in *Railroad Commission v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956) (*Alvin*) contains this language:

> "It is fundamental that in Texas the fixing of domestic utility rates is a legislative function of the state government.... Utility rates as rules of conduct are prospective only and do not in any manner involve an 'adjudication' of rights arising from a 'past' controversy. It is true that the fixing of rates requires a study of existing and past facts, but the rate as promulgated is not 'res adjudicata' of any fact so studied. *Therefore our primary concern in this type of case is to examine, construe, and apply existing legislation.*" (emphasis added).

The emphasized sentence indicates that the *Alvin* court was mindful of the first of two distinctly different questions to be considered when administrative agency regulations and orders are sought to be made retroactive. The first question is one of statutory construction; that is, whether the statute conferring rate-making power is intended by the Legislature to permit the agency to amend or establish rates with retroactive effect. *See Deacon v. City of Euless,* 405 S.W.2d 59 (Tex.1966). The second question is one of constitutional law. If the Legislature did intend to permit the agency to promulgate rates with retroactive effect, is the pertinent statute, or a particular exercise of agency power under it, subject to constitutional objection because, for example, it destroys or impairs vested rights? *See generally,* Annot. 153 A.L.R. 1188, *et seq.*

Stated generally, rate-making by an administrative agency is an exercise of its legislative function, though this doctrine and its outgrowth are factors which render it nearly impossible to achieve certainty in the field of administrative law. Under modern conditions the proposition has been said to be untenable. Schopflocher, *The Doctrine of Res Judicata in Administrative Law,* 1942 Wis.L.Rev. 39, 40. Rate-making in Texas under the present statutory law requires an orchestration of an agency's quasi-legislative and quasi-judicial functions not required at the time of the *Alvin* decision.

▮ We first consider whether, under existing statutory requirements, the Legislature intended the Commission to amend or establish rates with retroactive effect. The enactment of TAPTRA considerably augmented and in many cases superseded earlier regulatory statutes and the common law of judicial review of administrative orders. It has the effect of blending the quasi-legislative function of rate-making and the quasi-judicial function of agency adjudication of contested cases. Section 3(2) of TAPTRA expressly includes rate-making proceedings within the definition of "contested case." Such proceedings are "adjudicative hearings" by definition and are "now characterized by the full range of procedural safeguards in sections 13 through 19 of the Act." *Southwestern Bell Tel. Co. v. Public Utility Comm'n, supra,* at 510.

▮ The statute under which rates were promulgated in the present case, PURA, expressly incorporates the provisions of TAPTRA to the extent they are not in

conflict with PURA. PURA § 4. PURA provides for judicial review under the substantial evidence rule, that is, in a manner other than by trial *de novo*. *Id.*, § 69.

In the matter of rate-making, PURA § 43 places upon the utility a duty to initiate rate-making proceedings. The utility does so by filing a statement of intent to change its rates. The Commission is required to hold a hearing on the request "in every case in which the change constitutes a major change in rates...." Section 43(f) then provides as follows:

"If, after hearing, the [Commission] finds the rates to be unreasonable or in any way in violation of any provision of law, the [Commission] shall determine the level of rates to be charged or applied by the utility for the service in question and shall fix the same by order to be served upon the utility; these rates are thereafter to be observed until changed, as provided by this Act."

A utility may, under Section 43(e) of PURA, implement its own system of unofficial rates pending a determination of what the official or legal rates shall be for utility service. It is plain, nevertheless, that the utility may ultimately keep only so much of the resulting revenue as is produced by the legal or official rates, for it must refund or credit against future income any excess resulting from the implementation of its own unofficial rates. These unofficial rates must cease to be charged when the Commission establishes official or legal rates. PURA § 43(f).

The legal or official rates established or fixed by the Commission under PURA § 43 are subject, of course, to judicial review under TAPTRA § 19, which sets forth the procedure for review and the grounds for reversal or remand by the court. In pertinent part [section 19(e)], TAPTRA reads as follows:

"[The reviewing court] may affirm the decision of the agency in whole or in part and shall reverse or *remand the case for further proceedings* if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (emphasis added).

A district court is, therefore, expressly empowered upon review to remand the case to the agency "for further proceedings." This necessarily implies that the proceedings in the agency, after remand, shall be of such a nature as to give effect to the reviewing court's judgment, within the possible range of actions permitted the agency under the statutes which govern its actions. The Legislature did not intend for remand to be a sterile remedy under TAPTRA § 19.

The Legislature may "specify the kind and nature of review to be employed by the courts...." *Gerst v. Nixon*, 411 S.W.2d 350 (Tex.1966). The Supreme Court of Texas has expressly held that the Legislature, in its enactment of TAPTRA, intended to substitute "an *adequate legal remedy* for the equitable power of the court to review a rate order on the constitutional ground of confiscation." (emphasis added). *Southwestern Bell Tel. Co. v. Public Utility Comm'n, supra*, at 510. We believe that TAPTRA was also intended to be an adequate legal remedy for the loss resulting from agency rate-making which does not rise to the level of "confiscation"; that is, the loss resulting from the agency's promulgation of rates that are something less than just, fair and reasonable.

■ If TAPTRA § 19 was intended to be an "adequate" legal remedy, it necessarily follows that it was intended to be meaningful in its grant of power to a reviewing court to "remand the case for further proceedings" in the agency. For that power to be effective or real, the agency to which remand is made must have the legal competency or power to conduct any "further proceedings" directed by the court.

■ Where there exists a statutory right of appeal from an administrative agency's action, this right is normally an adequate remedy to preclude the issuance of an injunction against enforcement of a rate order. Annot. 8 A.L.R.3d 839, *et seq. See also Tonahill v. Gulf States Utilities Co.*, 446 S.W.2d 301 (Tex.1969) (involving an analogous administrative proceeding in eminent domain and holding that the right of appeal is an adequate legal remedy precluding injunctive relief). Thus, if the remedy of remand under TAPTRA § 19 is meaningful and effective, and if the agency must correct whatever errors it committed to the appellant's prejudice, the utility in the present case would have an "adequate legal remedy" and it would not be necessary to suspend the Commission's final order, under PURA § 85, in order to prevent irreparable loss.

■ If the utility's contentions of error are finally sustained on judicial review, the proper judgment will be one of remand to the agency with instructions to re-deter-mine the utility's annual revenue increase in light of the final decisions made upon the utility's various contentions of error. In redetermining such annual revenue increase, the agency might conclude that a higher amount would be justified, and direct the utility to implement a system of rates sufficient to produce that higher increase. Any order to that effect should not make the resulting rate implementation effective back beyond February 28, 1981, the effective date of the agency's original order now under judicial review. Section 43(f) of PURA expressly provides that the Commission's rates shall be fixed by order to be served upon the utility and "these rates are *thereafter* to be observed until changed as provided by (PURA)." We believe that this provision precludes making the Commission's new rates effective at any date earlier than February 28, 1981. *C. f. Public Utility Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1942); *United Gas Public Service Co. v. State*, 89 S.W.2d 1094 (Tex.Civ.App.—Austin 1935, writ ref'd). To implement any new, and presumably higher rates, the Commission will necessarily have to provide a mechanism, such as a surcharge, to allow the utility to collect prospectively the rates it should have been allowed to collect from February 28, 1981 forward.[3] We hold that this is the scheme intended by the Legislature in its provisions for judicial review, set out in TAPTRA § 19.

This holding is necessary to avoid the anomalies listed below and to give practical

---

**3.** Certain utility customers may receive a windfall or unfairly bear the cost of any higher rates set by the Commission after remand, depending upon whether they cease to be customers before implementation of the new rates or become new customers after that point in time. It does not follow, however, that any remand is rendered meaningless or ineffective for that reason.

Section 43 of PURA deals with two different problems: (1) the fixing by the Commission of *final* official or legal rates on a system-wide basis under subsection (f); and (2) the allowance of *temporary* rates pending final hearing, set either by the Commission under subsection (d) or by the utility under subsection (e).

These temporary rates are allowed to compensate for any administrative delay.

In fixing final rates, the Commission does not act to adjust debits and credits between the utility and its customers on an individual basis, nor does it do so when the agency sets temporary rates. There is no provision for refund in either case. The matter of refunds arises only in connection with temporary rates set by the utility unilaterally. While any inequity or defect in the refund system may be a problem within the competency of the Commission to cure by regulation, it is not a matter logically affecting whether errors were made by the Commission in arriving at the final rates, the subject of judicial review in this case.

effect to PURA and TAPTRA. It follows from this holding that the judicial review provided by TAPTRA § 19 will be effective and orderly, and the utility company will not win an appellate victory that is illusory, having spent time and money in a review on the merits while having its only effective remedy determined on an interlocutory basis.

The contrary interpretation of PURA and TAPTRA is burdened with many conceptual and practical difficulties, and is fundamentally opposed to clear and specific directions contained in those two statutes, and many fundamental legal and equitable principles as well.

■ The Legislature could not have intended for the courts named in PURA § 85 to consider that an erroneous rate order would automatically result in irreparable loss. Such orders have long been presumed valid and TAPTRA § 19(c) provides that they are not vacated by the filing of a petition for judicial review in cases of this kind. To uphold a contention that the general prohibition against retroactive rate-making prevents meaningful judicial review in a rate case is to concede that the loss occasioned by an erroneous rate order is, indeed, "irreparable." Such an interpretation is opposed to the specific directions in PURA § 85 that applications for "stay" or suspension orders are to be considered on a case-by-case basis, with no special or different treatment being called for in a rate case. This interpretation is also clearly opposed to the plain and obvious fact that the Legislature intended that TAPTRA § 19 be an adequate remedy in "contested cases," which includes rate cases by definition.

Furthermore, it is difficult to conceive that the Legislature intended for the courts named in PURA § 85 to determine the merits in a particular instance of judicial review on an *interlocutory* basis, bypassing an effective review by the district court, but that is the effect in a rate order case when an appeal is measured by a "substantial evidence" standard applied to the same agency record to be examined by the district court on the merits. When that estimate is made by an appellate court, in an interlocutory appeal colored by other considerations, a district court may be influenced, perhaps unfairly and unduly, in its own independent consideration of that same agency record on the merits. This influence would subvert both the right to an original review in the district court and the right to further judicial review expressly provided by TAPTRA § 20.

■ Having held that the Legislature intended, in its enactment of PURA and TAPTRA § 19, to allow for "retroactive rate-making" to the limited extent of permitting, on remand, a meaningful proceeding to correct errors made in the original agency proceeding and final order, we must now examine whether these statutes, and this particular application of it, are constitutional. We hold that they are so.

■ Article 1, § 16 of the Constitution of Texas expressly forbids retroactive legislation. It has been held to prohibit a change in utility rates that "would retroact so as to change the substantial rights and obligations of" the implied contract that exists between the utility and its customers. *Amarillo Gas Co. v. City of Amarillo*, 208 S.W. 239 (Tex.Civ.App.—Amarillo 1919, no writ). More importantly, however, Article 1, § 16 has been consistently construed not to invalidate *all* retroactive legislation. Unless *vested* rights are destroyed or impaired, a statute is not invalid even though it operates retrospectively. *McCain v. Yost*, 155 Tex. 174, 284 S.W.2d 898 (1955).

■ In determining whether a retroactive statute impairs or destroys vested rights, the most important inquiries are (1) whether the public interest is advanced or retarded, (2) whether the retroactive provision gives effect to or defeats the *bona fide* intentions or reasonable expectations of affected persons, and (3) whether the statute

surprises persons who have long relied on a contrary state of the law. *See generally, Texas Water Rights Comm'n v. Wright,* 464 S.W.2d 642, 648–649 (Tex.1971); Smith, *Retroactive Laws and Vested Rights* (pts. I–II), 5 Texas L.Rev. 231 (1927) and 6 Texas L.Rev. 409 (1928), respectively.

 We believe that no person has a vested right to any particular system of utility rates, but only a right shared with others in whatever legal or official rates are established by the governmental authority charged to do so, in this case the Public Utility Commission. The public generally, and all affected persons, also have a general right to the promulgation of rates that are, in this context, "just, fair and reasonable." PURA § 18. No one has a vested right in any other rate.

 In the context of the present case, no person can have a vested right in any rate other than the last legal or official rate promulgated by the Commission. While the utility, under PURA § 43(e), may temporarily implement another system of lawful rates, those rates cease to be lawful when the utility is served the Commission's order directing the implementation of new legal or official rates. In the present case, the Commission directed that such new rates be implemented effective February 28, 1981. If these new official or legal rates are finally adjudged valid, the judgment pronouncing their validity relates back to February 28, 1981, and they are valid *ab initio.* No one ever had a right thereafter to charge or pay for the utility's services according to any other system of rates. If these new official or legal rates are finally adjudged invalid, they were never effective at all to vest a right in anyone, notwithstanding that they were lawfully used to calculate charges in the interim under TAPTRA § 19(b)(3), which provides that these rates shall not be suspended pending judicial review.

 We hold, then, that no vested rights are impaired or destroyed by our interpretation of TAPTRA and PURA, and the application of our interpretation to the present case.

In light of our holdings in this case, it is unnecessary for us to discuss the adequacy of the bond tendered by the utility and whether it is reasonably probable that the utility will succeed in a hearing on the merits in district court.

 There being no threat of an irreparable loss to the utility pending judicial review, we hold that the district court did not abuse its discretion in denying the utility's application to suspend the Commission's order.

To protect the rights of the parties pending any review of our judgment by the Supreme Court of Texas, we order that the injunction entered by this Court on April 2, 1981, be continued in full force and effect until June 1, 1981, unless the Supreme Court of Texas enters its order before that date either denying or granting similar relief.

The judgment of the trial court is affirmed.

Affirmed.

PHILLIPS, Chief Justice, concurring.

I concur in the denial of the temporary injunction.

Bonded rates, *i. e.,* those that Southwestern Bell asks us to reinstate, do not constitute the "last, uncontested, peaceable" status. PURA § 43(e)[1] permits bonded rates, but requires that they terminate upon final rate approval by the Commission. Section 43(e) requires the refunding of any excess rates collected while the bonded rates were in effect. The obvious reason for requiring those refunds simply is that the bonded rates are set by the Company and not the

---

1. All references are to Public Utilities Regulatory Act (PURA), Tex.Rev.Stat.Ann. art. 1446c (1980).

Commission. Consequently, the rates which the Company sets for itself terminate upon final rate approval by the Commission.

No provision of section 43(e) or any other section of PURA confers authority on a court exercising judicial review over a Commission order to extend the effectiveness of bonded rates promulgated by a utility after those rates have been superseded by the adoption of a final rate by the Commission. See *Arkansas Louisiana Gas Co. v. Railroad Commission*, 586 S.W.2d 643 (Tex.Civ.App. 1979, writ. ref'd n. r. e.). The provisions of section 43(e) do not extend beyond final order, therefore granting appellant's request would require this Court to affirmatively determine that the bonded rates are reasonable rates to be charged during the pendency of appeal. No provision of PURA or of the Administrative Procedure Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Supp. 1980–1981) grants such authority to this Court.

The only provision which addresses the subject of available relief that may be granted during the pendency of an appeal from a Commission order is section 85 of PURA. That section makes no provision for the extension of rates bonded pursuant to section 43(e). Indeed, section 85 refers solely to the *regulatory authority order, ruling or decision.*

Should we grant appellant's prayer to enjoin the enforcement of the Commission order, which under section 85 of PURA we have authority to do, the Commission's prior order, the last uncontested rate, would then be reinstated. *State v. Southwestern Bell Telephone Co.*, 526 S.W.2d 526 (Tex.1975). Since the rate would give appellant a lesser return, appellant has not shown that it would sustain any injury that we could prevent.