## PUBLIC UTILITIES COMMISSION OF OHIO ET AL. *v.* UNITED FUEL GAS CO. ET AL.

No. 87.   Argued December 8, 1942.—Decided January 11, 1943.

*Mr. Kenneth L. Sater*, with whom *Mr. Thomas J. Herbert*, Attorney General of Ohio, was on the brief, for appellants.

*Mr. Harold A. Ritz*, with whom *Mr. Freeman T. Eagleson* was on the brief, for appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal from a decree of the District Court for the Southern District of Ohio enjoining the enforce-

ment against appellee, United Fuel Gas Company (hereafter called United), of orders made by the Public Utilities Commission of Ohio, 46 F. Supp. 309.

The facts are not in dispute. The Portsmouth Gas Company, a public utility, sells natural gas at retail to the people of Portsmouth, Ohio. It purchases its entire supply of gas from United, a West Virginia corporation. The gas is conveyed through pipelines in a continuous flow from points of production in West Virginia and Kentucky into Ohio, and there delivered to the Portsmouth Gas Company. On February 24, 1932, the City of Portsmouth, under the authority given it by § 614–44 of the Ohio General Code, established the rates to be charged to Portsmouth consumers for natural gas distributed by the Portsmouth Gas Company. This ordinance did not purport to fix the charges made by United for the gas sold to the Portsmouth Gas Company. Claiming that the rates fixed by the city were unreasonable and unjust, the Portsmouth Gas Company challenged the ordinance before the Public Utilities Commission of Ohio. The Commission found that the complaint was justified, and that reasonable and just rates should be substituted for those prescribed by the ordinance. But it also found that it could not determine such rates in the absence of proof that the charges which United exacted from the Portsmouth Gas Company were just and reasonable. The Commission ruled that the sale of gas by United to the Portsmouth Gas Company for resale to consumers in Portsmouth was a public utility service within the meaning of § 614–2 of the Ohio General Code, and that the rates to be charged for such service were subject to its jurisdiction. Accordingly, on April 18, 1935, the Commission ordered that United prepare and present "all pertinent and relevant testimony and exhibits tending to prove a reasonable and just rate to be charged by it to the Portsmouth

Gas Company for the furnishing of natural gas for distribution within the City of Portsmouth, Ohio."

United thereupon filed a petition for rehearing with the Commission. The petition asserted that the gas sold by United to the Portsmouth Gas Company was in interstate commerce, that the two companies were wholly independent of one another, and that the Commission therefore went beyond the power of the state in asserting jurisdiction to fix the rates to be charged for gas sold by United to the Portsmouth Gas Company. United recognized, however, the authority of the Commission to compel it to produce evidence in its possession relevant to a determination of just and reasonable rates to be charged by the Portsmouth Gas Company for gas sold to its customers. This proffer of testimony by United, which was not accepted by the Commission, is relevant to the disposition of this controversy: "It [United] does not question the right of said Commission to call upon this petitioner for such evidence and facts as may be in its possession which may show or tend to show what would be a reasonable rate to be charged for gas to the consumers in the City of Portsmouth, and it offers to furnish to the Commission such facts and evidence as may be desired, or to permit any officers or agents of the Public Utilities Commission of Ohio to ascertain such facts and evidence as may be desired from its records and books for the purpose aforesaid, but denies and protests the right or power of said Commission to fix the rates at which petitioner shall sell the gas which it transports into the State of Ohio and delivers to the Portsmouth Gas Company."

On May 29, 1935, the Commission denied this petition. Its order expressly reaffirmed its previous assertion of jurisdiction to fix the rates to be charged for the sale of gas by United to the Portsmouth Gas Company.[1]

---

[1] "The Commission further finds that the furnishing of natural gas by the United Fuel Gas Company to the Portsmouth Gas Company

This suit to restrain enforcement of the two orders of the Commission followed. In its original bill, filed July 3, 1935, United alleged that the Commission's orders were an unconstitutional attempt to regulate interstate commerce; that compliance with the orders would entail an expenditure of more than one hundred thousand dollars in order to make the usual appraisals required in determining a rate base; that disobedience to the orders would subject United and its agents to fines of a thousand dollars a day. These allegations were denied by the Commission. But on September 23, 1935, the parties stipulated that "it will cost the plaintiff a substantial sum of money, in excess of three thousand dollars, to comply with the Commission's order."

The bill was still pending at the time of the enactment of the Natural Gas Act of June 21, 1938, 52 Stat. 821, 15 U. S. C. § 717, and the relevance of that statute to the present controversy was duly set forth in an amended bill filed March 8, 1939. The suit did not come to issue for more than two years thereafter. The death of one of the members of the District Court, necessitating reargument and reconsideration of the case, may explain, at least in part, why a case of such public importance should have proceeded at such a leaden-footed pace.[2] It was not until

for resale to consumers within the City of Portsmouth, Ohio, is a public utility service within the meaning of Section 614-2, General Code of Ohio; that the rates to be charged therefor are subject to the jurisdiction of this Commission; that such jurisdiction includes the right to regulate the rate or price to be charged for such service, and that the exercise of such jurisdiction is necessary for a determination of the matters and things herein at issue before this Commission."

[2] The bill was filed on July 3, 1935, and on the same day a temporary restraining order was issued by District Judge Hough. The case was submitted to a District Court of three judges on September 23, 1935, but on November 19, 1935, before it was decided, Judge Hough died. An amended complaint was filed on November 20, 1936, and a second amended complaint on March 8, 1939, to which answer was made on April 25, 1939. A third amended complaint filed on April 8, 1941,

January 16, 1942, that the decree now under review was entered. The District Court held that, regardless of what the situation might have been in the absence of the Natural Gas Act, that statute deprived the Ohio Commission of power to regulate the rates to be charged for gas transported and sold in interstate commerce. And so the court enjoined the enforcement of the Commission's orders against United.

The Commission contends that the issues of this case lie outside the scope of the Natural Gas Act because the Commission was concerned with the establishment of rates for the sale of gas by United to Portsmouth Gas Company prior to the effective date of the federal Act, and, more particularly, to fix rates retroactive to February 24, 1932, when the city of Portsmouth prescribed the rates for gas sold to consumers by the Portsmouth Gas Company in the ordinance which gave rise to the proceedings before the Commission. This contention, if correct, would require us to consider whether the Commerce Clause, of its own force, invalidated the Commission's assertion of jurisdiction over the rates upon gas shipped by United into Ohio.

was followed on April 24, 1941, by a motion to dismiss which was denied on July 8, 1941. On July 28, 1941, an application for leave to file an answer was made; this application was granted on August 4, 1941, and an answer was filed the same day. The cause having finally been submitted, the District Court filed an opinion on October 2, 1941, finding that the plaintiff was entitled to injunctive relief. And on January 16, 1942, the decree now under review was entered.

The 1942 Annual Report of the Director of the Administrative Office of the United States Courts (p. 7) discloses that "The median time which elapsed from filing to disposition of civil cases terminated in the district courts during the year 1942, which had been tried to court or jury, excluding land condemnation, habeas corpus, and forfeiture proceedings, was 10.7 months; and from issue to trial it was 6.1 months. . . . This compares with periods of 10.2 months and 5.3 months, respectively, in 1941."

But we must reject the contention of the Commission. It rests upon the assumption that under the Ohio law the state Commission can retroactively fix the rates of United. For it must be borne in mind that the ultimate issue in this suit is the assertion by the Ohio Commission in 1935 of power to fix appellee's rates; that the Commission has not yet exercised the power which it thus asserted; that it has not made the inquiry and the findings which must precede the establishment of new rates; that United has not posted any bond to secure refunds it might be ordered to make; that the Commission's jurisdiction to fix United's rates was denied by the District Court in its decree of January 16, 1942; and that, so far as rates in the past are concerned, the power of the Ohio Commission (apart from any limitations imposed by federal law, whether constitutional or statutory) is dependent upon the authority possessed by it under Ohio law. To sustain the Commission on this phase of the case we would have to find that it was the law of Ohio that the Commission had power to fix rates upon gas sold by United to the Portsmouth Gas Company which would be retroactive to February 24, 1932, when the city of Portsmouth prescribed the rates upon gas sold by the Portsmouth Gas Company to its customers.

Unfortunately we are not aided by a finding of the lower court on this question of state law. Since the District Court was composed of three Ohio judges, they may perhaps have taken Ohio law on this point so much for granted as not to require statement. Under ordinary circumstances we would prefer to leave to others the task of formulating local law. But this case has already been too long in the federal courts, and we do not think it comports with the public interest to remit the controversy for explicit findings by the District Court as to the power of the Ohio Commission to fix rates retroactively. The situation here is quite different from *Rail-*

*road Comm'n* v. *Pullman Co.*, 312 U. S. 496. Where the disposition of a doubtful question of local law might terminate the entire controversy and thus make it unnecessary to decide a substantial constitutional question, considerations of equity justify a rule of abstention. But where, as here, no state court ruling on local law could settle the federal questions that necessarily remain, and where, as here, the litigation has already been in the federal courts an inordinately long time, considerations of equity require that the litigation be brought to an end as quickly as possible.

The proceeding before the state Commission arose under § 614–44 *et seq.* of the Ohio General Code (Page, 1926), dealing with appeals to the Commission from municipal ordinances establishing rates to be charged by local utilities. Whenever such an appeal is taken, as it was taken here by the Portsmouth Gas Company, the Commission is required to hold a hearing. § 614–44. If, after such hearing, the Commission finds that the rate fixed by the ordinance is unjust or unreasonable, it must determine the just and reasonable rate to be charged "during the period so fixed by ordinance . . . and order the same substituted for the [ordinance] rate . . ." § 614–46. It is clear that under this section of the statute the Commission can establish just and reasonable rates in lieu of those fixed by the ordinance, and can make its order effective retroactively by ordering refunds of charges in excess of the substituted rates. In re Columbia Gas & Fuel Co., 1941 Rep. Ohio P. U. C. 22; In re Wheeling Electric Co., 1941 *id.* 69; In re East Ohio Gas Co., 1939 *id.* 15. The Commission undoubtedly has power, therefore, to establish a just and reasonable rate, retroactive to February 24, 1932, for gas sold by the Portsmouth Gas Company to the people of that community.

But whether the Commission has similar power with respect to rates for gas sold by United to the Ports-

mouth Gas Company—and that is the controlling inquiry here—is an entirely separate question. Section 614–46 is inapplicable because the rates to be established would not be in lieu of rates fixed by ordinance. The Commission's authority to inquire into the reasonableness of the rates charged by United for gas sold to the Portsmouth Gas Company is to be found in §§ 614–21 and 614–23, which provide as follows: "Upon complaint in writing, against any public utility, by any person, firm or corporation, or upon the initiative or complaint of the commission that any rate . . . is in any respect unjust unreasonable, unjustly discriminatory, or unjustly preferential or in violation of law, . . . the commission shall notify the public utility" and hold a hearing. If, after such hearing, the Commission finds that the rate or charge is unjust, unreasonable, or otherwise unlawful, it must "fix and determine the just and reasonable rate, fare, charge, toll, rental or service *to be thereafter* rendered, charged, demanded, exacted or collected for the performance or rendition of the service, and order the same substituted therefor." § 614–23 (italics added). The statute in terms thus gives the Commission power to prescribe such rates prospectively only. If, after notice and hearing, the Commission finds rates to be unlawful, it can then fix the just and reasonable rates "to be thereafter" charged. The establishment of new rates must be preceded by a finding that the old rates are unjust and unreasonable, and the new rates are prospective as of the date they are fixed. There is no basis in the statute for concluding that the Commission's orders can be retroactive to the date when the Commission's inquiry into the rates was begun; on the contrary, the explicit language of the statute precludes such a construction.

Its annual reports show that the Commission has consistently followed what would seem to be the plain mandate of the statute. See, e. g., In re Amherst Water Works

Co., 1941 Rep. Ohio P. U. C. 88; In re Cincinnati Gas & Electric Co., 1940 *id.* 14; In re Union Gas & Electric Co., 1936 *id.* 67. Whatever doubts there may have been about the matter appear to have been removed by the decision of the Supreme Court of Ohio in *Great Miami Valley Taxpayers Assn.* v. *Public Utilities Commission,* 131 Ohio St. 285, 2 N. E. 2d 777, which affirmed a ruling of the Commission that "it was without power to make a refund in a proceeding instituted under and by virtue of the provisions of Section 614–23, General Code." 131 Ohio St. 285, 286. It is not surprising, therefore, that counsel for the Commission did not contend before us that the Commission has power under Ohio law to establish retroactively just and reasonable rates to be charged by United for gas sold to the Portsmouth Gas Company. Our examination of the relevant Ohio materials convinces us that the Commission has not been given such authority.

The Commission in this case has not yet done more than assert its jurisdiction over United's rates. It has not yet held a hearing upon the reasonableness of United's present rates; it has made no finding whether these rates are unlawful and whether new rates should be substituted; it has not entered upon an inquiry to determine what rates would be just and reasonable. As of the date of the enactment of the Natural Gas Act, therefore, the proceeding before the Commission, so far as United was concerned, was still in an embryonic stage. And we can find no provision of Ohio law which would authorize the Commission to enter orders fixing United's rates retroactive to any date prior to June 21, 1938, when the federal Act became law. The Commission's orders must be treated here, therefore, for purposes of determining whether they are in conflict with federal law, constitutional or statutory, as if they had been made after the enactment of the Natural Gas Act. The case cannot now be disposed of on the basis that would have governed had it come here in

1935. To inquire into the powers the Commission had that year, or any other year prior to the enactment of the Natural Gas Act in 1938, would be to ascertain an abstract question of law. The question we are called upon to decide, and it is the only question, is whether the District Court properly entered the decree under review. That decree was entered on January 16, 1942, after the enactment of the Natural Gas Act, and after United, in filing an amended bill of complaint, based its claim for relief upon that Act. It is familiar doctrine that an appeal in an equity suit opens up inquiry as of the time of the ultimate decision. To decide this appeal on the basis of a legal situation that ceased to exist not only prior to the taking of this appeal but also before issue was finally joined in the District Court, would be to make a gratuitous advisory judgment. It is the case that is here now that must be decided, and it must be decided on the basis of the circumstances that exist now. Cf. *Vandenbark* v. *Owens-Illinois Co.*, 311 U. S. 538, 542–43, and cases there cited.

And as to rates effective in the future we agree with the District Court that the Natural Gas Act of 1938 governs. Congress by that Act, the constitutionality and scope of which we canvassed last Term in *Federal Power Comm'n* v. *Pipeline Co.*, 315 U. S. 575, and *Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498, preëmpted the regulatory powers over the transportation and sale of natural gas in interstate commerce. Section 1, after declaring that "Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest," makes the Act applicable to "the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such

transportation or sale." Rates and charges in connection with the sale or transportation of gas in interstate commerce are required to be "just and reasonable." § 4 (a). Companies subject to the Act must, under § 4 (c), file with the Federal Power Commission schedules of rates and charges, and no changes in such schedules can be made without notice to the Commission and the public. § 4 (d). Acting upon either its own motion or complaint of a state or municipality, or a state regulatory body or gas distributing company, the Commission can inquire into the legality of rates and charges of companies subject to its jurisdiction, and can determine the just and reasonable rates and charges thereafter to be observed. § 5 (a).

It is clear, as the legislative history of the Act amply demonstrates, that Congress meant to create a comprehensive scheme of regulation which would be complementary in its operation to that of the states, without any confusion of functions. The Federal Power Commission would exercise jurisdiction over matters in interstate and foreign commerce, to the extent defined in the Act, and local matters would be left to the state regulatory bodies. Congress contemplated a harmonious, dual system of regulation of the natural gas industry—federal and state regulatory bodies operating side by side, each active in its own sphere. See H. Rep. No. 2651, 74th Cong., 2d Sess., pp. 1–3; H. Rep. No. 709, 75th Cong., 1st Sess., pp. 1–4; Sen. Rep. No. 1162, 75th Cong., 1st Sess.

Upon the undisputed facts in this record, United is plainly subject to the exclusive jurisdiction of the Federal Power Commission with respect to the rates and charges for natural gas transported by it from West Virginia and Kentucky to Ohio. And, indeed, in compliance with the Act, United has submitted itself to the jurisdiction of the federal agency and filed schedules of its rates and charges. No changes in such schedules can be made without notice to the Power Commission. That Commission,

468

on its own motion, can inquire into the lawfulness of such rates; if the public interest so requires, rates found to be just and reasonable may be substituted. It is indisputable, therefore, that if the Ohio Commission today made the orders complained of in this suit, it would be intruding in a domain reserved to the federal regulatory body. The power to fix rates for natural gas transported and sold in interstate commerce has been entrusted solely to the Federal Power Commission. It does not follow, of course, that the Act bars a state commission, in the appropriate exercise of its jurisdiction, from compelling the production of evidence relevant to the proceeding before it. But the orders before us went beyond this limited purpose. They undertook to assert a jurisdiction which the state body does not possess. In our conclusion regarding Ohio law, we hold only that the assertion of power by the Public Utilities Commission of Ohio must be construed in the light of its authority under the Ohio statutes. And, as thus construed, the order cannot be reconciled with the action of Congress in enacting the Natural Gas Act of 1938. Because the orders are not an assertion of jurisdiction to fix the rates of United prior to the enactment of the federal Act, it is unnecessary to decide whether, in the absence of federal statute, the state could successfully attempt to fix the rates charged by an interstate natural gas company for gas transported and sold from one state to another.

Since these orders are invalid insofar as they impinge upon an authority which Congress has now vested solely in the Federal Power Commission, the decree below must stand unless we can fairly conclude that it was an abuse of discretion for the District Court to grant relief by way of injunction. It is perhaps unnecessary at this late date to repeat the admonition that the federal courts should be wary of interrupting the proceedings of state administrative tribunals by use of the extraordinary writ of in-

junction. But this, too, is a rule of equity and not to be applied in blind disregard of fact. And what are the commanding circumstances of the present case? First, and most important, the orders of the state Commission are on their face plainly invalid. No inquiry beyond the orders themselves and the undisputed facts which underlie them is necessary in order to discover that they are in conflict with the federal Act. If, therefore, United complies with these orders, it will be put to the expenditures incident to ascertaining the base for rate-fixing purposes— expenses which may ultimately be borne by the consuming public and which Congress, by conferring exclusive jurisdiction upon the federal regulatory agency, necessarily intended to avoid. If United does not comply with the orders, it runs the risk of incurring heavy fines and penalties or, at the least, in provoking needless, wasteful litigation. In either event, enforcement of the Commission's orders would work injury not assessable in money damages, not only to the appellee but to the public interest which Congress deemed it wise to safeguard by enacting the Natural Gas Act. In these circumstances, we cannot set aside the decree of the District Court as an improper exercise of its equitable jurisdiction. *Petroleum Co.* v. *Public Service Commission,* 304 U. S. 209, was a very different case. There the regulation of intrastate rates alone was involved, no conflict between federal and state authorities was in issue, and the appeal to equity sought to anticipate the appropriate exhaustion of the administrative process.

Two minor objections to the jurisdiction of the court below need not detain us long. The Johnson Act of May 14, 1934, 48 Stat. 775, 28 U. S. C. § 41 (1), is inapplicable here because the orders of the state Commission "interfere with interstate commerce" to the extent that they constitute an attempt to regulate matters in interstate commerce which Congress has lodged exclusively with the

Federal Power Commission. And, unlike the appellant in *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 310–11, United exhausted all administrative remedies available to it before bringing this suit. In its petition for rehearing, United requested the state Commission to modify its original order of April 19, 1935, so as to strike out those portions which we now hold to be in conflict with the federal Act. Only after the denial of this petition did United seek relief in the courts.

As we construe the decree of the District Court, it does not prevent the Public Utilities Commission of Ohio from requiring United to produce data in its possession which may be relevant to a determination of the just and reasonable rates to be charged by the Portsmouth Gas Company for gas sold to the consumers of that city. As has already been noted, United, in its petition for rehearing before the Commission, offered to produce such evidence. And apparently throughout this entire litigation it has held itself ready to do so. The orders of the Commission were assailed only insofar as they subjected United to the jurisdiction of the state Commission with respect to rates for gas imported by it into Ohio. We therefore read the decree of the District Court as an injunction against enforcement of the Ohio Commission's orders only to the extent that this assumption by the Commission of rate-making power over United has been resisted. So read, the decree is

*Affirmed.*

Mr. JUSTICE BLACK dissenting, with whom Mr. JUSTICE DOUGLAS and Mr. JUSTICE MURPHY concur.

As a result of this decision, delays incident to obtaining a federal injunction have made wholly futile the diligent efforts of the State of Ohio to fix reasonable gas rates for

the people of Portsmouth, Ohio.[1]  I cannot agree with the suggestion implied here that this results from any cause other than the unwarranted interposition by courts into the business of rate making.  Cf. *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 435.  Here eight years after the Ohio Public Utilities Commission made United a party defendant in order to fix rates "to be charged" by it, Ohio is told that United may keep any sum collected, no matter how unjust or unreasonable the rates charged may have been; and Ohio's citizens are denied the right to recoup possible losses because the Commission "has not made the inquiry and the findings which must precede the establishment of new rates."  There is one reason, and only one reason, why the Commission has not made such inquiry and findings—before any step could be taken toward establishing a final rate order, and even before a single witness could be heard, this federal injunction stopped the state Commission in its tracks.  Had the Commission proceeded to make inquiry and findings in the face of the injunction it would have risked the possibility that its members, agents, and attorneys could have been seized and fined or imprisoned for contempt of court.  *Ex parte Young*, 209 U. S. 123.  If it be true, which I think dubious, that under Ohio law rates can never be fixed as of the date a proceeding begins even though delays are the consequence of improvident federal injunctions, such a legal situation makes it all the more essential that the court below should have abstained as a matter of "equi-

---

[1] The suggestion in the opinion of the Court that the State is free to continue its efforts to control the rate of the local company, Portsmouth Gas, so long as it does not interfere with United, the company which supplies Portsmouth Gas, accords a privilege of little meaning.  The price charged Portsmouth Gas by United is about 70% of the amount which the City Council considered a reasonable rate for Portsmouth Gas to charge.  It is obvious that the Portsmouth Gas rate cannot be materially affected without in turn altering the United charge.

table fitness or propriety," *Prentis* v. *Atlantic Coast Line,* 211 U. S. 210, 229, from tying the Commission's hands and barring it from making the final order here held to be vital. To stop these proceedings at the threshold and thus bar all possible relief for the years during which the litigation crawled along its interminable course seems to me far less justifiable than the action condemned by this Court in *Petroleum Co.* v. *Public Service Commission,* 304 U. S. 209.

The federal action halting the Ohio rate-making process since 1935 is justified wholly on the ground that the Natural Gas Act, passed in 1938, bars regulation by Ohio of United's rates since 1938, while Ohio law is said to bar any regulation prior to 1938 because no final order has yet been made by the Public Utilities Commission. The Court refuses to hold categorically that Ohio law nullifies this order, asserting instead that Ohio law requires us to interpret the Commission's order as not attempting to lead to rate making for the period 1935–1938. This will doubtless prove some surprise to the Commission, which made the order in question in 1935, and which has argued both here and below that the Natural Gas Act is irrelevant because it took effect subsequent to the period in which the Commission is now interested. Whether the Court considers that Ohio law bars the Commission from making a valid order, or whether it uses its knowledge of Ohio law to tell the Commission what the Commission has attempted, is immaterial—in either case we press our conception of Ohio law on the Ohioans. But the local law question has never been squarely decided in Ohio. That question is whether United can successfully, by taking full advantage of the delays of the federal judicial system, jockey the City of Portsmouth and the State of Ohio into such a position that no one can now determine what were reasonable rates for the period prior to 1938.

Reference to state cases and particularly to *Great Miami Taxpayers Assn.* v. *Public Utilities Commission,* 131 Ohio St. 285, 2 N. E. 2d 777, does not solve this problem, for, in the first place, under the state law all appeals to the Ohio Supreme Court are explicitly conditioned upon the posting of bond by the utility to secure payment of any damage resulting from delay. § 548 Ohio Gen. Code. Such security for which the state law provided should have been exacted by the lower court here, *Inland Steel Co.* v. *United States,* 306 U. S. 153, 156; cf. *United States* v. *Morgan,* 307 U. S. 183, 197. "It is especially fitting that equity exert its full strength in order to protect from loss a state which has been injured by reason of a suspension of enforcement of state laws imposed by equity itself." *Public Service Commission* v. *Brashear Freight Lines,* 312 U. S. 621, 630. The Ohio Supreme Court might well conclude that this failure of the court below to require appropriate security justifies the Commission in establishing a rate for a period prior to 1938. In addition, the very fact that the State Public Utilities Commission and the legal representatives of the State of Ohio have vigorously fought this case for four years since the passage of the Natural Gas Act is indication that they at least do not suppose that the State is powerless to fix rates as of the date United was made a party defendant. We have been cited to no case in which the State Supreme Court has held that an injunction against rate proceedings must result in such inordinate returns as the respondent here may receive.

Under these circumstances our opinion as to the local law "cannot escape being a forecast rather than a determination." *Railroad Commission* v. *Pullman Co.,* 312 U. S. 496, 499. What was said by the Court there is equally applicable here: "The last word on the meaning of Article 6445 of the Texas Civil Statutes, and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the

district court but to the supreme court of Texas. . . . The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court." [2] Here as there "If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise." *Ibid.,* 500, 501.

Even assuming, with the Court, that this delay in the judicial process bars the petitioners from the particular relief sought under local law, I still think we should hold that this injunction was improvidently granted. We are given as the bases of federal equity jurisdiction these propositions: The State order is on its face "plainly invalid"; United will be put to considerable expense in complying with it; non-compliance will result in heavy penalties or in costly litigation. In my opinion none of these separately nor all taken together provide any ground for federal jurisdiction.

What has been said above concerning the necessity of allowing state courts to decide state law is in my view adequate answer to the argument that the order is "plainly invalid." Ohio law in this respect could be adequately interpreted and enforced in Ohio courts. In addition, I do not consider the order before us ripe for review. It is simply a declaration of status requiring nothing of United other than coöperation in exploration of the rate problem for the purpose of eventually setting United's rates, and is thus as properly outside the realm of review now as if this were "an attempt to review a valuation made by the Interstate Commerce Commission which has no immediate legal effect although it may be the basis of a subsequent rate order." *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 129. In this respect, the instant case is identical with *East Ohio Gas*

---

[2] For other cases exemplifying this viewpoint, see *Watson* v. *Buck,* 313 U. S. 387, 402.

*Co.* v. *Federal Power Commission,* 115 F. 2d 385, 388. Unless the other grounds of alleged equitable jurisdiction take it outside the scope of the *Rochester* case, this is not the appropriate time for review.

We are told that United will be put to great expense by compliance with the Commission's order, in that it must provide certain statistical data necessary so that the Commission may complete its study of the rate problem. It is not suggested that this cost in itself is any reason for enjoining the proceeding, nor could it be unless *Petroleum Co.* v. *Commission, supra,* 220, is to be overruled; but the special circumstance offered here is that Congress by passage of the Natural Gas Act sought to prevent such an expenditure. We are given no argument and cited to no legislative history indicating that Congress had any desire to preclude the states from protecting state consumers against unfair rates for the period prior to the passage of the federal Act.

I am not as sure as the majority of the Court that refusal of United to comply with the Commission's order will in fact subject it to heavy penalties.[3] But assuming that this order is backed by the penalty clause, the case should be governed by what we said recently in *Petroleum Co.* v. *Public Service Commission, supra,* 220: "No order has been entered fixing rates or regulating conduct. The necessity to expend for the investigation or to take the risk of non-compliance does not justify the injunction. It

---

[3] The penalty provisions of the Ohio statute, §§ 614–64 and 65 are applicable where a rate or refund order is disobeyed, *State ex rel. Ohio Bell Telephone Co.* v. *Court of Common Pleas,* 128 Ohio St. 553, 555, 192 N. E. 787, but it may be that orders of the sort here involved are covered by §§ 614–6 and 7, providing for the examination of records and the production of witnesses. If this is so, review may be obtained under Ohio practice without fear of penalty prior to a final judicial determination. See e. g. *Mouser* v. *Public Utilities Commission,* 124 Ohio St. 425, 179 N. E. 133. We are cited to no cases which indicate which of these procedures governs this order.

is not the sort of irreparable injury against which equity protects." Cf. *Dalton Machine Co.* v. *Virginia,* 236 U. S. 699.

That United may be subjected to a course of litigation before its rights under the Ohio law are fully determined is the least of all reasons for this use of equity jurisdiction. The compelling consideration here is that "Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact." *Myers* v. *Bethlehem Corp.,* 303 U. S. 41, 51.

The judgment below should be reversed and the State of Ohio permitted to continue as best it can in view of the long delay caused by the unfortunate intervention of the federal courts.