### DEPARTMENT OF CONSERVATION OF STATE OF LOUISIANA et al. v. FEDERAL POWER COMMISSION.

#### No. 11241.

Circuit Court of Appeals, Fifth Circuit.

March 31, 1945.

Rehearing Denied April 18, 1945.

E. Leland Richardson, Sp. Asst. Atty. Gen., and Sam H. Jones, of Lake Charles, La., for petitioners.

Tom J. McGrath, of Washington, D. C., for interveners-petitioners National Coal Association and others.

**Charles V. Shannon, Gen. Counsel,** Louis W. McKernan, Principal Atty. and William L. Brunner, Senior Atty., all of Washington, D. C., for Federal Power Commission.

Hamilton E. Little and Charles C. Crabtree, both of Memphis, Tenn., for City of Memphis, Tenn.

William F. Barry, Sol. Gen., of Nashville, Tenn., for State of Tennessee.

Alden T. Shotwell, of Monroe, La., and T. A. McEachern, Jr., of New York City, for Memphis Natural Gas Co.

David W. Heath, Asst. Atty. Gen., for Railroad Commission of Texas.

Louis E. Clevenger, of Topeka, Kan., for Kansas Corporation Commission.

Carl I. Wheat and Robert E. May, both of Washington, D. C., for Independent Natural Gas Ass'n of America.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

In culmination of a loop line construction program of long standing,[1] Memphis Natural Gas Company, on January 31, 1944, and on May 20, 1944, applied for certificates of convenience and necessity, and on November 21, 1944, obtained an order granting them.[2] This petition filed under Sec-

---

[1] Beginning its operations as an interstate pipe line company in 1928, its system consisted of an 18-inch pipe line extending from the Monroe, Louisiana, gas field through the States of Arkansas, Mississippi, and to Memphis, Tenn. For the past seventeen years it has supplied natural gas to various city gate utility distributing companies, in the States of Arkansas, Mississippi and Tennessee, the principal customer being the City of Memphis, Tennessee.

In 1940, it began a construction program of a loop line paralleling its original 18-inch pipe line from the Monroe field to Memphis. The proposed plan was to loop completely this line over a period of years. The purpose of the construction program was to provide pipe line capacity to meet the increased demands of its city gate customers.

In 1940, 92 miles of the looping were completed; in 1941, an additional 55 miles were constructed; in 1942, and also in 1943, the company attempted to complete the loop line construction, but, due to war emergency conditions, the materials and priority assistances were unavailable, and it was not until December, 1943, that the War Production Board granted approval and permit to construct the balance of the loop line.

In connection with the construction of the lines in 1940 and 1941, it was not necessary for the company to obtain a certificate from the Federal Power Commission. However, Section 7 of the Natural Gas Act was amended as of Feb. 7, 1942, and it became necessary for the company to obtain from the Federal Power Commission, a certificate of public convenience and necessity to construct the balance of the loop line.

[2] On Jan. 31, 1944, it filed with the Federal Power Commission its application for a certificate of public convenience and necessity for the construction and operation of 62.5 miles of loop lines. Intervening in this proceeding were the State of Tennessee, the Memphis Light, Gas & Water Division of the City of Memphis, Tennessee, and The Independent Natural Gas Association of America, supporting the application, and the Public Service Commission of Louisiana, the Department of Conservation of the State of Louisiana, the National Coal Association, the United Mine Workers of America, the Order of Railway Conductors, the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, and the Switchmen's Union of North America, opposing it.

On May 20, 1944, the company filed with the Commission an application for a certificate of public convenience and necessity for the construction and operation of a gas transmission line from Guthrie, Louisiana, in the Monroe gas field to Lisbon gas field in Claiborne Parish, Louisiana.

The same parties supporting and opposing the granting of the first certificate oppose this one also.

On June 10, 1944, the Commission, stating in its opinion and order that a sufficient showing of adequate gas reserve had not been made, denied and dismissed without prejudice the application for the certificate in the looping project. A petition for rehearing, reconsideration and reversal of the Commission's order of June 10, 1944, was made and granted, and an opportunity to present further evidence was provided.

The two Dockets involving the certificates for the looping project and the Lisbon line were consolidated by order of the Commission, and a hearing in the consolidated causes began on September 7, and was concluded on Oct. 5, 1944.

tion 19(b)[3] of the Natural Gas Act,[4] seeks to vacate and set these orders aside.

In their motion for rehearing before the Commission, petitioners did formally make the point that the applicant had not shown itself possessed of sufficient reserves to adequately perform the service to the public for which the certificates were sought. But the real point made against the order in the rehearing was, and the real point made against it here is, that the certificates of public convenience and necessity may not stand because they were issued to permit the withdrawal of gas, and irreplaceable natural resource, for burning under boilers, an industrial use, that is regarded as inferior and wasteful, and, therefore, the granting of the certificates was not in, but against, the public interest.

■ The subordinate claim that the proof is insufficient to support the finding that the company has adequate supplies to enable it to properly serve the public interest may be disposed of in short order by saying that the record amply supports the commission's finding both that there was a public need to be served and that the applicant for the certificates showed itself adequately equipped to perform it.

The main contention, that the order is invalid and the certificates may not stand because issued for a wasteful use of gas, is, we think, no better taken, but a demonstration of this will require some further reference to the Act, to the proceedings before the commission, and to the authorities governing the review of its orders.

■ The Natural Gas Act was enacted to vest, and it did vest, the commission with jurisdiction to regulate the transportation and sale of natural gas for re-sale in interstate commerce.[5] Section 7(c) of the Act, as amended, 15 U.S.C.A. § 717f, requires those desiring to engage in such transportation or sale, or to construct, extend, acquire or operate any facility thereunder, to apply to the commission for a certificate of public convenience and necessity. Section 7(e) of the Act governs the issuance of certificates. It provides: "a certificate shall be issued to any qualified applicant therefor, * * * if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, * * * is or will be required by the present or future public convenience and necessity; * * *"

Petitioners do not claim that the Memphis Natural Gas Co. is not a qualified applicant or that it has not the financial ability to constitute, finance and operate the proposed facilities. The commission has found on evidence amply supporting it that the applicant has assured itself adequate gas reserves for the operation of the line. The commission has also found that the proposed extension is, or will be, required by the present or future public convenience and necessity, and viewing the matter entirely from the standpoint of consumer demand for the gas, the evidence is of such conclusive character that it demands the finding that was made. Petitioners' reliance, however, is not on the ordinary considerations which control where the dispute is between rival companies, as it was

On Nov. 21, 1944, the Commission entered its Opinion and order, issuing certificates of public convenience and necessity for the construction and operation of both the loop line and the Lisbon line.

Petitioner here filed application for rehearing and stay order in the consolidated Docket, and it was denied on Dec. 12, 1944, and on Dec. 21, 1944, this petition was filed.

3 As material here, it provides 15 U. S.C.A. § 717r: "Any party to a proceeding under this act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the circuit court of appeals * * *. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

4 15 U.S.C.A. §§ 717-717w.

5 Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371; Natural Gas Pipeline Co. v. Federal Power Commission, 315 U.S. 575, 62 S.Ct. 736, 86 L. Ed. 1037; Public Utilities Commission v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L. Ed. 333.

in Arkansas Louisiana Gas Co. v. Federal Power Commission, 5 Cir., 113 F.2d 281, or over rates or the limits of federal and state power, as it was in cases cited in Note 5, above. They base their whole case on reading the words "public conveyance and necessity" as including considerations of conservation of natural gas with a consequent prohibition against the issuing of certificates where, as here, there is protest and proof by a state that the gas to be withdrawn under the authority of the certificates will be put to an economically wasteful use, that is to the inferior one of being burned under boilers. Pointing to the evidence of the already highly developed industrial use of the gas, and the evident purpose to extend and increase that use, petitioners insist that this sustains its burden of showing that the finding of fact by the commission, that the issuance of the certificates will be required by the present or future public convenience and, necessity, is not supported by substantial evidence. The applicant and those aligned with it on the side of the commission insist that in granting or refusing certificates under the act, the kind of uses, viewed from the standpoint of inferior and superior, to which the gas to be carried in the line is to be put, is of no, or at least of very little, significance. The commission, they say, is concerned only with whether there is a public need or demand for the gas the line will supply and whether the applicant is in a position to adequately and properly serve that need if the certificate is granted. The commission, while of the opinion that the Act leaves questions of conservation to the state authorities and does not make the granting or refusal of certificates turn upon such questions, points out that it did, as shown by its two opinions in the case,[6] give sympathetic consideration to the fact of inferior use along with all the other facts in the case. So pointing it insists that the record as a whole furnishes no basis for petitioners' claim that its finding, that the certificates are required by the present or future public convenience and necessity, is without support in the evidence.

■ We agree with the commission. Assuming, without deciding, that the commission could properly consider as one of the facts entering into the granting or de-

---

[6] In opinion of June 10, 1944, refusing the certificate on the loop line, the commission did comment, on the capacity of standby-fuel equipment on the premises of certain industrial consumers, and on the fact that the estimated demand anticipated demands of new customers, including a number proposed to be converted from the use of other available fuels to natural gas for boiler fuel purposes.

Too, it concluded: "(3) In view of the limited natural gas reserves shown by the record to be available to applicant, their present rapid rate of depletion, and the effect of excessive rates of withdrawal of the ultimate recovery of gas therefrom, it is necessary and appropriate in the public interest that such natural gas resources be conserved in so far as possible for domestic, commercial and superior industrial purposes. (4) The record does not contain sufficient showing that the proposed construction and operation are, or will be required by the public, or future public, convenience and necessity. (5) Dismissal of the instant application without prejudice is appropriate in the public interest."

In its second opinion on rehearing, entered November 21st, after hearing new evidence, the commission found that applicant had sufficiently and satisfactorily increased its gas supplies; and that in the public interest the certificates for the proposed loop line and Lisbon line should be granted. The opinion dealt fully with the contention as to the use of natural gas for inferior purposes, including the increased use from change over from coal to natural gas in future by customers of the plant. After pointing out that the question of the supply of natural gas had been a subject of communication by it to congress, it concluded that the small amount of additional gas to be sold by applicant (only about 1.3 percent of the total natural gas production of Louisiana) was not sufficient to cause any great loss.

The opinion concluded: "While we are not unsympathetic with the effort of the producing state of Louisiana to protect and conserve its natural gas resources for the benefit of its citizens, it is apparent that denial of applicant's request for these certificates will not afford the State of Louisiana a satisfactory solution of the problem posed by it. Such problem cannot be determined within the limits of these proceedings. It is reasonable, however, to condition the certificates so that the facilities herein authorized shall not be used for the transportation or sale of natural gas to any new customers of either Applicant or United, except upon specific authorization by this commission."

nial of the certificates the uses to which the gas was to be put, that is, that considerations of conservation had a place in such granting or refusal, we think it quite plain that the statute does not make such matters determinative. If, therefore, we assume, as the petitioners insist we should, that it was part of the commission's duty to consider, as one of the underlying facts to be determined, whether the gas being taken is for inferior, and therefore wasteful, uses, we should still, upon this record, have to decline to hold that, in exercising, the commission has abused, its powers under the Act. Normally it is for the commission to draw the conclusion that the present or future public convenience and necessity either requires or does not require the granting of a certificate. Normally an order granting a certificate may be set aside only when the evidence admits of but one conclusion, that its granting will not serve public convenience and necessity, or that the applicant is not in a position to supply the need. Inferior and superior uses aside, the evidence in this case leaves in no doubt that there was a public need. It fully supports the finding, too, that the applicant has contracts which put it in a position to fully supply that need. As we read the statute and the authorities under it, the facts, on which alone petitioners rely, that the gas is to be taken out of the state to be used for burning under boilers, that this is an inferior use, and that Louisiana objects to its being so taken, do not furnish sufficient basis for a finding that the order of the commission in granting the certificates was contrary to law. Throughout the argument and briefs it has been contended, not so much on the part of the commission as on the part of those aligned with it, that the case in the end comes down to this, that Louisiana, under the guise of conservation against waste, is trying to monopolize for use in Louisiana, the gas the state produces, and it is urged upon authority [7] that this can not be done. The petitioners deny that they are trying to prevent proper movement of gas in interstate commerce. They insist that all that they are doing is to present evidence that the use to which the gas will be put under the certificates is a most inferior one,

and that this being undisputed, the commission, as matter of law, could not grant the certificates and we must set them aside. We have looked in vain for a criterion for such action on our part. Petitioners do not point us to, we have found no, guiding language in the Act, or in any decision construing it, which supports this view or, indeed, points in this direction. Viewing petitioners' contention in the light most favorable to them, the best that can be said upon this record for petitioners is that they made an issue upon whether the fact that some of the gas to be taken under the certificates will be put to inferior uses was sufficient to cause a denial of the certificates. The commission thoughtfully and sympathetically considered the evidence tendered and determined that certificates qualified as they were qualified should issue. In so doing, it exercised the power of judgment confided to it and not to the courts. We think it plain that petitioners have failed to discharge the heavy burden the Act placed on them and that their petition should be denied.

---

[7] Penn. v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, 32 A.L.R. 300; State of Missouri v. Kansas Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L. Ed. 1027; Foster-Fountain Packing Co. et al. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147; West v. Kansas Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716, 35 L.R.A.,N.S., 1193.