412 F.2d 115
 TRI-STATE GENERATION & TRANSMISSION ASSOCIATION, Inc., Appellant,
v.
The PUBLIC SERVICE COMMISSION OF WYOMING, and Richard J. Luman, Walter W. Hudson, Francis Hillard, Zan Lewis and Rudolph Anselmi, as members thereof, and Alex J. Eliopulos, as its Secretary, Appellees, and
Cheyenne Light, Fuel & Power Company, Black Hills Power & Light Company, Lincoln Service Corporation, Pacific Power & Light Company, and Utah Power & Light Company, Intervenors.
 No. 9252.
 United States Court of Appeals Tenth Circuit.
 April 28, 1969.
 Rehearing Denied June 6, 1969.
 
 Raphael J. Moses, Boulder, Colo. (John J. Conway, Denver, Colo., and George P. Sawyer, Torrington, Wyo., were with him on the brief), for appellant.
 Don M. Empfield (Dean W. Borthwick, Atty. Gen., Lawrence E. Johnson, Chief Sp. Asst. Atty. Gen., and William D. Norman, Sp. Asst. Atty. Gen., Cheyenne, Wyo., were on the brief), for appellee Public Service Commission of Wyoming.
 Houston G. Williams, Casper, Wyo., Paul B. Godfrey, Cheyenne, Wyo., and Bryce E. Roe, Salt Lake City, Utah (Edgar J. Herschler, Kemmerer, Wyo., was with them on the brief), for intervenors.
 Before MURRAH, Chief Judge, and LEWIS, BREITENSTEIN, HILL, SETH, HICKEY and HOLLOWAY, Circuit Judges.
 PER CURIAM.
 
 
 1
 In this Wyoming federal question suit, Tri-State Generation and Transmission Association, Inc., sought unsuccessfully to enjoin the Wyoming Public Service Commission from interfering with increased contract charges for electrical power which it purchases from the Bureau of Reclamation and transmits over Bureau lines to Wyoming, where it is sold to its REA member cooperatives for retail distribution. The district court denied the application for the convention of a three-judge court on grounds that the suit was not an attack upon the constitutionality of a state statute, but rather that the statutes were being unconstitutionally applied to Tri-State, Bartlett & Co. Grain v. State Corp. Commission of Kansas, 223 F.Supp. 975, aff'd 338 F.2d 495, cert. denied 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154, and on the further grounds that the Commission had not exercised any jurisdiction over Tri-State.
 
 
 2
 Upon trial of the injunction issue, the court finally denied relief on somewhat the same grounds as for the rejection of three-judge jurisdiction; and upon the further ground that, in any event, the laws of Wyoming provided a plain, speedy and efficient administrative and judicial remedy for the adjudication of the matter in controversy. The court also found that Tri-State was not engaged in interstate commerce.
 
 
 3
 The operative facts are not materially in dispute. Tri-State is a nonprofit cooperative corporation with twenty-eight REA cooperative members in Colorado, Wyoming and Nebraska. It is governed by a board selected or elected from its members. Twelve of these members are located in Wyoming and are admittedly subject to the jurisdiction of the Wyoming Commission. Tri-State owns no electrical generating facilities and performs no physical functions. Its function is to purchase power wholesale from the Bureau of Reclamation, transport it over Bureau lines to Colorado, Wyoming and Nebraska for sale to its cooperative members for retail sale. The Bureau bills Tri-State for the wholesale price, and Tri-State in turn bills the members and pays the Bureau. Title to the power from the Bureau to Tri-State passes to members at the point of delivery in Wyoming, where the members' facilities are connected with the Bureau's transmission lines. Title passes immediately from Tri-State to the members for distribution to their customers. The members purchase all of their power needs from Tri-State by contract and Tri-State pays the Bureau for the use of the Bureau's facilities in Wyoming. There is no contractual relationship between the member cooperatives and the Bureau.
 
 
 4
 In order to firm up its power pool, Tri-State secured an REA loan to build transmission lines in Nebraska and Colorado. The increased price was assessed against the members to amortize the REA loan.
 
 
 5
 When the new contracts and increased contract schedules were tendered to the Wyoming Commission for filing, the Commission declined to accept them and notified the members that they would have no effect until the Commission had evaluated and passed upon their propriety. A short time later the Commission enlarged upon the reasons for its action in a directive to all of the Wyoming members, in which it characterized Tri-State as the wholesale power contracting agent for the Wyoming members, and noted that no formal application had been made concerning the proffered contract and no information or data had been provided on which the Commission could make a ruling. It was careful to note that the directive was not intended in any way to foreclose further consideration of the matter but indicated quite clearly that it would look with disfavor upon the increase, observing that if one entity should be permitted to rationalize or determine a utility rate by considering and depending upon facilities owned and operated by another entity, the legal and proper bases for rate making as now applied by the utility industry are all rendered worthless. The Commission directive, although leaving consideration of the matter open, left little doubt of its intent to assume jurisdiction over the contracts.
 
 
 6
 As a result of this action, the Wyoming members have not paid the increased contract rate and Tri-State has been greatly hampered in the performance of its functions, and particularly in the amortization of its REA loan. Its case is based upon the proposition that the services it performs are in interstate commerce and the charges made are for transactions in commerce over which the Wyoming Commission has no jurisdiction.
 
 
 7
 The threshold question is whether the court erred in refusing to convene a three-judge court. The question is, of course, controlled by 28 U.S.C. § 2281, which provides in substance that no injunction restraining the enforcement, operation or execution of any state statute by restraining the action of any officer of such state in the enforcement or execution of such statute; or of an order made by an administrative board or commission acting under state statute, shall be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges.
 
 
 8
 We hold that the district court properly refused to request the convention of a three-judge court. Swift & Co. v. Wickham, 382 U.S. 111, 124, 86 S.Ct. 258, 15 L.Ed.2d 194, points out that the purpose of § 2281 is to expedite important litigation and not to delay it while the proper composition of the tribunal is litigated. This principle was applied in Green v. Board of Elections of the City of New York, 2 Cir., 380 F.2d 445, 449, cert. denied 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840, and within this circuit in Bartlett & Co. Grain, supra. As in the latter case, the real question here presented is not whether the Wyoming Commission has acted under unconstitutional statutes but whether its action has interfered with interstate commerce to such an extent as to justify favorable injunctive relief for Tri-State. On this issue our starting point is the trial court's finding that Tri-State is not engaged in interstate commerce and the jurisdictional limits imposed by 28 U.S.C. § 1342, which provides that the district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a state administrative agency or a rate-making body of a state political subdivision, where:
 
 
 9
 "(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and
 
 
 10
 (2) The order does not interfere with interstate commerce; and,
 
 
 11
 (3) The order has been made after reasonable notice and hearing; and, (4) A plain, speedy and efficient remedy may be had in the courts of such State."
 
 
 12
 We think it clear that the trial court erred in determining that Tri-State was not engaged in interstate commerce. The electrical energy involved in these transactions undoubtedly moves across state lines, and to that extent, interstate commerce is involved, but it remains the property of the transmitter until it is delivered to the facilities of the members in Wyoming. Title passes in Wyoming. The trial court ruled that since the title to the electricity passed at point of delivery without any additional transmission by Tri-State, the transaction does not involve interstate commerce. And the subsequent transaction between Tri-State and its members at point of delivery in Wyoming is entirely intrastate, and Tri-State is therefore not engaged in interstate commerce. The court thus seems to say that the Wyoming arrangement between Tri-State and its members is merely a paper transaction, or in any event, it is the contracting agent of its members. But it does not seem permissible to say that all of this corporate arrangement is a mere paper mechanism. Surely Tri-State performs a useful service, so recognized by the REA, which closely supervises the whole REA program. And the services and functions of Tri-State, as those services and functions probe the question of interstate commerce, are indistinguishable from the factual background considered by the Supreme Court in Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549, the rationale of which was restated by the high court in Federal Power Commission v. Southern California Edison Co., 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638. The dictates of those cases clearly require a finding that Tri-State is engaged in interstate commerce and we must pass to the question of whether the orders and directives of the Wyoming Commission interfere with that commerce, and, if so, whether the extent of such interference justifies federal injunctive relief.
 
 
 13
 The Wyoming Commission, unlike the Rhode Island Commission in Attleboro, supra, asserts no jurisdiction over Tri-State and properly recognizes that its jurisdiction begins and ends with the regulation of consumer rates originating from wholly intrastate utilities. We are not presently concerned with the question of whether the Commission must accept, as unassailable, the Tri-State contract price for wholesale electricity as a premise in the Commission's intrastate rate-making powers. Tri-State's contract price is not federally regulated as a rate either by the FPC or the REA and the Wyoming Commission has neither rejected nor accepted that price as a satisfactory basis for determining Wyoming consumer rates. We are concerned with the directives and orders of the Commission which have effectively prevented the Wyoming utilities from paying their contract obligations to Tri-State. This Commission action patently had the potential of interfering with interstate commerce and supports jurisdiction under 28 U. S.C. § 1342(2).
 
 
 14
 The trial court entered its judgment in this case in November 1966 after hearing the case but a few months after issuance of the Commission orders. At such time the force of the Commission orders had had but a negligible impact on interstate commerce. The Commission had specifically invited all interested parties to present their views to that body and had recognized that it was uninformed on both the factual and legal issues that might affect or govern the Commission's rights or duties in the transaction. The trial court in its judgment specifically noted, and correctly so, that the entire controversy might well be determined with the administrative procedures of Wyoming to the satisfaction of all. Under the then existing circumstances we think it was well within the trial court's discretion to deny immediate injunctive relief to Tri-State. However, due to lapse of time,[1] it is apparent that changed circumstances are such that we now consider a case different from that presented to the trial court and one which requires us to reach a different result. Such procedure is not without precedent. In Brotherhood of R. R. Trainmen v. Denver & R. G. W. R. Co., 370 F.2d 833, cert. denied 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456, we held that a district court judgment, regardless of its correctness when entered, must be reversed when a statutory change presented to the appellate court a different case than considered below. And the Supreme Court in the Permian Basin Area Rate Cases, 390 U.S. 747, 823-824, 88 S.Ct. 1344, 20 L.Ed.2d 312, rehearing denied 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379, has indicated that lapse of time itself will sometimes warrant appellate disposition of an issue which would ordinarily be remanded for original consideration to a lower court. As in Permian we consider it unnecessary to remand this case to the district court for further consideration. It is undisputable that the present hardship of the withholding of monies from Tri-State for a period of over two years now constitutes a severe impact on interstate commerce and that injunctive relief must be immediately given.
 
 
 15
 The case is remanded to the district court with instructions to vacate its judgment of dismissal and to grant permanent injunctive relief against the Wyoming Commission orders and directives which prevent the payment of such monies to Tri-State. No costs are awarded.
 
 
 
 Notes:
 
 
 [1]
 The delay in this case is in no way attributable to any action of the trial court or of counsel. Stated frankly, this court has simply experienced extraordinary but hopefully nonrepetitive difficulties in the decisional process
 
 
 
 16
 MURRAH, Chief Judge, with whom HICKEY, Circuit Judge, joins (dissenting).
 
 
 17
 I agree with almost everything Judge LEWIS says except the result he reaches. And, if I could consider myself estopped by my dereliction in this case, my agreement would be complete. But I do not believe we can rectify our inexcusable neglect by awarding Tri-State injunctive relief when we would not have done so if the case had been timely considered and decided.
 
 
 18
 Some review of our case and case law will serve to put my position in its proper perspective and delineate our differences. We are met at the threshold with the stern admonition against federal equity interference with the state regulatory processes, especially rate-making cases. The Supreme Court has repeatedly denounced abuse of the federal equity power in cases of this kind. See Public Utility Commission of Ohio v. United Fuel Gas Co., 317 U.S. 456, 468, 63 S.Ct. 369, 87 L.Ed. 396; Petroleum Exploration Company v. Public Service Commissioner of Kentucky, 304 U.S. 209, 58 S. Ct. 834, 82 L.Ed. 1294. The Congress has erected definite barriers to its exercise. See 28 U.S.C. §§ 1341, 1342; and see also 28 U.S.C. § 2283. § 1342 forbids the federal courts to enjoin or suspend any order affecting utility rates made by a state rate-making body:
 
 
 19
 (1) In a diversity suit based on the repugnance of the order to the Federal Constitution; and,
 
 
 20
 (2) If it does not interfere with interstate commerce; and
 
 
 21
 (3) If it is made after reasonable order and hearing; and,
 
 
 22
 (4) If a plain, speedy and efficient remedy is available in the state courts.
 
 
 23
 The only justification for federal injunctive relief in this case is that the action of the Wyoming Commission interferes with interstate commerce. Judge Kerr held that a speedy and efficient remedy was available. No one seems to seriously contend otherwise. He did not think that the action of the State Commission interfered with interstate commerce because Tri-State was not so engaged.
 
 
 24
 I agree with the majority that Tri-State's operations are in commerce — that power purchased by Tri-State in Nebraska for transmission and sale, wholesale in Wyoming, was in commerce. Contrary to what the Wyoming Commission and the Trial Court seem to think, I cannot say that the functions are parasitical or without substance. Whether the power lines to be constructed in Nebraska and amortized in part by the proposed charges for power purchased by the Wyoming Cooperatives is "used or useful" to them for rate-making purposes, is not before us, and is undoubtedly within the purview of the State Commission. The Commission has not asserted jurisdiction over Tri-State's operations. Indeed, it has specifically disclaimed jurisdiction on the perfectly valid ground that it is not a Wyoming public utility. By its directive to the Wyoming Cooperatives it left little doubt, however, of its attitude toward the proposed charges as a part of the rate base of the Wyoming Cooperatives. The directive has apparently precluded the proposed charges with a consequent chilling effect on Tri-State's interstate operations.
 
 
 25
 But the fact that the Commission's directive adversely affects Tri-State's interstate operations is not a mandate for federal injunctive relief. The federal equity court may, and should, abstain where, as here, a plain, speedy and efficient remedy is available. This is not a case of peremptory federal regulation, as in F.P.C. v. Southern California Edison, 376 U.S. 205, 215, 84 S.Ct. 644, 11 L.Ed.2d 638. The F.P.C. has specifically disclaimed any jurisdiction over REA-financed cooperatives, such as Tri-State. The REA exercises exclusive supervision ever the planning, construction and operation of the cooperatives' facilities which it finances, even more comprehensively than the regulatory supervision which the F.P.C. exercises over investor-owned utilities. See Salt River Project Agricultural Improvement and Power District v. Federal Power Commission, 391 F.2d 470, 473. It has not expressed any concern over the State action though its interest is undoubtedly directly involved.
 
 
 26
 This being so, the "bright line" between state and federal jurisdiction drawn in F.P.C. v. Southern California Edison, supra, is not so distinct in our case. Rather, ours is an Attleboro case, pure and simple, and the question becomes whether state regulations or state interference with the interstate operations are precluded by force of the interstate commerce clause without more, so as to require federal equity intervention. I do not think so.
 
 
 27
 Our case is somewhat like Public Utility v. United Fuel Gas Company, supra, though it differs materially on fact, and in my judgment, leads to a different result. In that case, the Ohio Commission asserted its jurisdiction over an interstate wholesalers of gas, prior to the advent of the Natural Gas Act (15 U.S.C. § 717 et seq.), the counterpart of the Federal Power Act. (16 U.S.C. § 791a et seq.) But, upon the enactment of the Natural Gas Act, the wholesaler became subject to the exclusive jurisdiction of the F.P.C. with respect to rates and charges of its interstate sales. The orders of the Ohio Commission became plainly invalid. "No inquiry beyond the orders themselves and the undisputed facts which underlie them is necessary in order to discover that they are in conflict with the federal Act." Public Utilities Commission v. United Fuel Gas Co., Id. at p. 469, 63 S.Ct. at 376. The wholesalers ran the risk of incurring heavy fines and penalties, and needless and wasteful litigation if it failed to comply with the state regulatory order. Equitable consideration unquestionably dictated federal injunctive relief. "Interference with interstate commerce" was plain and unequivocal. Enforcement of the Commission's order would work irreparable injury.
 
 
 28
 In these circumstances, and in view of the inordinate delay in the three-judge federal court, the Supreme Court could not say that the injunctive relief was an improper exercise of equitable jurisdiction. But conceding, as we do, that our case is an Attleboro case, it is important to note that Attleboro reached the Supreme Court through the exhaustion of state remedies, as did State of Missouri ex rel. Barrett v. Kansas Natural Gas, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027. And it is also important that the trial court has declined equity jurisdiction in deference to an adequate state remedy.
 
 
 29
 Our case is more like Petroleum Exploration Co. v. Public Service Commission, supra, where, as here, "the federal courts are asked to stop at the threshold, the effort of the Public Service Commission of Kentucky to investigate matters entrusted to its care * * *." And where the court said that "The extraordinary powers of injunction should be employed to interfere with the action of the state * * * `Only a case of manifest oppression will justify a federal court in laying such a check upon administrative officers acting colore officii in a conscientious endeavor to fulfill their duty to the state'".
 
 
 30
 For these reasons I would affirm the judgment of the trial court.